## H. V. Schroeder, Appellee, v. Daniel Otto et al., Appellants. Minier Manufacturing Company, Appellee, v. Daniel Otto et al., Appellants.

### Gen. No. 7,875.

1. CORPORATIONS—*power of individual directors and officers to bind corporation by contract for their individual benefit fixing obligation upon corporation.* Officers and directors of a corporation have no power to bind the corporation, without authority duly conferred, by a contract among themselves and for their individual benefit, a part of the consideration for which is the establishment of an indebtedness against such corporation, whether the transaction is fair and equitable or otherwise.

2. FRAUD AND DECEIT—*negligence of person deceived by false representations as defense in suit to procure relief therefrom.* Where it appears, in a suit between the original parties to a transaction, that one party has been guilty of an intentional and deliberate

fraud, by which, to his knowledge, the other party has been misled or influenced in his action, he cannot escape the legal consequences of his fraudulent conduct on the ground that the fraud might have been discovered had the party deceived exercised reasonable diligence and care.

3. DURESS—*procuration of contract by threats of criminal proceedings against member of promisor's family as duress where charges false.* Where a stockholder of a corporation of which his son-in-law had been manager was confronted with a report of an audit of the corporate books purporting to show shortages in his son-in-law's accounts, and under threats of prosecution of the son-in-law was induced to execute a contract for the benefit of other stockholders of such corporation, without opportunity to consult counsel or to make any independent investigation of the truth of such charges, which were in fact false, such contract was procured by duress, although no criminal complaint was actually made or warrant issued.

4. RESCISSION AND CANCELLATION—*sufficiency of evidence to support finding execution of contract procured by fraudulent representations falsely made and relied upon by complainant.* In a suit to cancel and set aside a contract between individual stockholders of two interlocking corporations, a finding that the execution of the contract by complainant was procured by fraudulent representations respecting alleged shortages in the accounts of complainant's son-in-law as manager of one of such corporations, upon which complainant relied and which the parties or their agent knew to be untrue, and under threats by such parties that such son-in-law would be prosecuted criminally if complainant did not sign, held not manifestly against the weight of the evidence.

5. HARMLESS AND PREJUDICIAL ERROR—*affirmance of decree rescinding contract without determination which of two grounds alternatively shown by evidence actually existed.* Where the evidence shows that the execution of a contract resulted from a mutual mistake of fact, or that it was procured by means of fraudulent representations as to material matters, relied upon by the opposite party and known to be false by the party making such representations, a decree of cancellation will be affirmed without determining which of such possible causes was in fact operative to effect the agreement.

Appeal by defendants from the Circuit Court of Tazewell county; the Hon. JOHN M. NIEHAUS, Judge, presiding. Heard in this court at the April term, 1925. Affirmed. Opinion filed April 15, 1926.

DAILEY, MILLER, McCORMICK & RADLEY and STONE & TAYLOR, for appellants.

SHURTLEFF & NIEHAUS, for appellee H. V. Schroeder.

JESSE BLACK, JR., for appellee Minier Manufacturing Co.

PER CURIAM.

On August 7, 1922, appellee H. V. Schroeder, acting for himself and as president of the Minier Manufacturing Company, a corporation, entered into a contract with Daniel Otto individually and as vice president of the Schroeder Manufacturing Company, a corporation, William F. Oehler, A. H. Nafziger, Stuart Walters and E. W. Wickert, appellants, by the terms of which appellee Schroeder agreed to purchase certain shares of stock of the individual appellants in the Minier Manufacturing Company, and there was a purported accounting of the affairs and differences between said corporations and a cancellation of indebtedness between said corporations and an adjustment of differences between said individual parties.

The complainant Schroeder was born and raised near the village of Minier in Tazewell county and had lived in Minier for about 30 years. He was a man about 55 years of age, had accumulated a considerable property but had little education and had, to a large extent, intrusted the bookkeeping and details of his business to others. Appellee Schroeder and his brother, Ernest Schroeder, in 1903 started the business of the Schroeder Manufacturing Company which consisted of making and selling a portable grain elevator and dump, as it was sometimes called, and for a number of years it was a comparatively small business. In the beginning appellee and his brother worked in the factory. About the year 1908, appellee's brother Ernest withdrew and appellee continued the business.

In about 1908, C. W. Bird, who had been a school teacher, married the daughter of appellee Schroeder, and was engaged by his father-in-law to assist in the business. The business ran along in this way for a couple of years, appellee furnishing all of the capital and being the owner of the entire business. In 1910, appellee sold a one-fourth interest in the business to appellant Daniel Otto, who was a farmer living in McLean county, and who had purchased the first three machines manufactured by Schroeder Bros. for use upon his farms. Otto had also acted as agent for the Schroeder Bros. in the sale of the machines when he could get away from his farm work. During the next eight years appellee Schroeder and his son-in-law, Bird, together with appellant Otto, conducted the business of the Schroeder Manufacturing Company. In 1918, appellee Schroeder sold an additional one-fourth interest in the business to appellant William F. Oehler, and at that time, and for a considerable period thereafter, the business was successful and earned a good income.

Early in 1919 Bird and Simon Schroeder, son of appellee, commenced the manufacture of washing machines and in July, 1919, the washing machine business was incorporated under the name of the Minier Manufacturing Company and will be called the Minier Company. Appellee was not one of the incorporators of the Minier Company and did not own any stock until six months after the incorporation when he purchased some from his son Simon. Bird was the manager of the Minier Company from its inception until the time of trial. The Schroeder Company and the Minier Company used the same office room, the same bookkeeper and had the same manager, Bird, until a short time prior to August 7, 1922, when the Schroeder Company moved into another office and secured another bookkeeper and manager. When they officed together their affairs were somewhat intermingled and they

loaned machinery back and forth from one factory to another, but kept their business separate and kept distinct sets of books. In December, 1919, appellants Stuart Walters and E. W. Wickert were traveling salesmen and visited Minier. They were offered good positions with the Minier Company, Walters as general manager and Wickert as sales manager. They bought some shares of stock in the Minier Company, as appellants claim, from appellee Schroeder, Wickert buying seven shares and Walters 34 shares at $150 per share. When they bought the stock Bird told them that if they became dissatisfied with their purchase he would buy the stock from them at the price they had paid. On November 1, 1920, a controversy having arisen over their salaries, they requested Bird to repurchase their stock, and he bought from them giving them notes due in 90 days. Appellants Walters and Wickert continued in their positions with the company and in 60 days went to Bird and desired to repurchase their stock from him. Wickert then bought his seven shares back at $150 per share and Walters purchased 27 shares back at the same price, Bird retaining seven shares of the Walters stock and each were notified by Bird that he should feel under no obligation to repurchase the stock. Walters and Wickert at that time had been in the active management of the business for about 11 months. On or about January 1, 1920, appellee Schroeder sold an additional one-fourth interest in the Schroeder Company to appellant A. H. Nafziger for $26,000. In payment therefor appellee Schroeder took the personal judgment notes of Nafziger for $12,000, which were signed also by Nafziger's mother, and notes for $14,181.60, made out directly to appellee Schroeder and not to his order, but containing the following statement: ''This note is given and received in payment of one-fourth of the inventory of the merchandise on hand in the factory of H. V. Schroeder Mfg. Company, a partnership, consisting of

H. V. Schroeder, Daniel Otto and William Oehler, on January 1, 1920. To secure the payment of this note I promise to pay H. V. Schroeder to be applied hereon $100.00 from the proceeds of the sale of each share of capital stock now owned by me, amounting to 400 shares of the H. V. Schroeder Mfg. Company (a corporation) organized July 1, 1920, successors to H. V. Schroeder Mfg. Co., a copartnership. All dividends received by me from the corporation shall be applied to the payment of this note. If I default in the above payments, or in case this note is not paid at maturity, I agree to assign to H. V. Schroeder enough shares of the H. V. Schroeder Mfg. Company at their book value to the amount of the unpaid balance thereon." This was a stock note in fact and shows that Nafziger secured substantially $26,000 in stock for $12,000. At about this time it appears Otto, Oehler and Nafziger purchased 100 shares of the stock of the Minier Company. There is a dispute as to whether the purchase was made from appellee Schroeder or from his son, Simon Schroeder, but so far as we can see it can make no difference in the result of this cause. Appellants contend that this last stock was purchased from appellee Schroeder. It is not contended by appellants that in any of the transactions set out there was any fraud or misrepresentations made on the part of appellee Schroeder, or by any of the parties to this suit. It is contended that as to the sale of the 100 shares of stock in the Minier Company to Otto, Oehler and Nafziger about January 1, 1920, that Bird approached them and informed them in the presence of appellee that the Minier Company had earned 15 per cent of its capital stock during the last four months of 1919, and that they were declaring a dividend of that amount for the benefit of the stockholders of the company in which appellants would not participate. Bird denies making the particular statement, but does state that he informed Otto on the train that he thought the com-

pany had earned 15 per cent of its stock and evidently Bird believed this statement to be true, and on February 1, 1920, a dividend of 15 per cent was declared to the stockholders, but later, upon an audit of the affairs of the company having been taken, the Minier Company recovered back from the government $1,400 in income tax it had paid. There is nothing to show that appellee Schroeder had any knowledge as to these facts and evidently Bird believed they had made the profit. It is shown in the record and is a matter of common knowledge that all business continued under the impetus of war conditions until well into or late in the year 1920. There is nothing, so far as we are able to glean from the record, of fraud or deceit on the part of appellee Schroeder or the Minier Company in transferring any of these properties of the stock to appellants.

Early in the year 1921, appellee Schroeder moved from Minier to Oak Park, in this State, and became interested in other business matters, visiting Minier about once a month. Stuart Walters also became a resident of Oak Park and engaged in other affairs. It is claimed by appellants that the Minier Company actually lost the sum of $2,000 during the year 1919. Late in the season of 1920 the slump came. During the year 1921 the Minier Company lost $36,000 and the Schroeder Company lost $41,225.12. It is contended by appellants that the stockholders who had bought stock "in the Minier Company at the exorbitant figure were naturally dissatisfied, and when they discovered that Bird's statements to them about the company and its stock were not true, they felt that Mr. Schroeder and Mr. Bird had taken advantage of the confidential relationship existing between them as partners in the Schroeder Company and as friends and acquaintances of long standing to unload upon them at a high value an interest in a company which never at any time had justified the investment," etc. Other differences had

arisen between these companies. Bird had been removed as manager of the Schroeder Company. Appellant Wickert, a stockholder in the Minier Company but not in the Schroeder Company, was employed by the Schroeder Company, and it was claimed when he took the position he found many errors or discrepancies in the books of account and matters unsettled, and that he declined to accept the responsibility for the books until the various items were disposed of so that he might start with a clean slate. Whereupon, it is claimed that it was agreed between appellee Schroeder and the other members of the Schroeder Company to employ a Mr. Lloyd of Bloomington to make an audit of the Schroeder Company. An audit was taken and it was claimed by Lloyd that there was a shortage in the bank account of $336.04, a file account shortage of $279.04, and a cash shortage of $20.75, and "taken from cash for local sales," $123.94, and an overdraft on Bird's salary of $500. It is claimed by appellants that each of these items was up for discussion among those interested in the Schroeder Company in May, 1922, and the respective views given, although no satisfactory conclusion was arrived at.

In May, 1922, and in August, 1922, when the contract hereinafter set out was executed, Bird owned the majority of the stock in the Minier Company, appellee Schroeder was president, C. W. Bird, manager, B. F. Quigg, secretary, Alma Ewing, treasurer, and appellee Schroeder, appellants Oehler, Otto, Quigg, Ewing, Bird and Duback were the directors. At the same time appellee Schroeder was a stockholder in and president of the Schroeder Company. Appellant Otto was a director and vice-president of the Schroeder Company and also director and president of the Minier Company. Appellants Oehler, Nafziger, Walters and Wickert were stockholders in and directors of the Schroeder Company. Some of the parties signing the contract mentioned were directors in and repre-

sented both companies. There was a meeting of some of these parties held at the home of Lloyd in Bloomington on August 7, 1922. It is charged in the bill that Lloyd, Wickert, Nafziger, Oehler, Walters and Otto planned to hold this meeting with the complainant Schroeder in reference to the sale of their stock in the Minier Company to the complainant. Lloyd was employed by the appellants and on the trial he stated that he was an industrial engineer. He described an industrial engineer as one "whose business was to ascertain facts and figures for his clients with which to work out plans to extricate them from unfavorable conditions and undesirable contact." He signed his reports as a "C. P. A.," meaning a certified public accountant, but the proof showed that he was not a certified public accountant under the laws of Illinois.

On Saturday, August 5, appellant Otto telegraphed to Walters at Oak Park telling him that a meeting would be held at Bloomington on August 7 and that on the evening of August 6 a telegram would be sent to appellee Schroeder, notifying him to be in Bloomington on August 7. The telegram to Walters directed him to see Schroeder Sunday evening, August 6, and "to bring him sure to Bloomington on a train leaving Chicago at ten o'clock Monday morning, August 7th, and reaching Bloomington at one-thirty in the afternoon." The telegram was sent to appellee Schroeder on Sunday evening, August 6. Schroeder had no knowledge of the meeting until Sunday evening, the sixth. Appellee Schroeder left Chicago on the appointed train, expecting to be met at Bloomington and taken by automobile to Minier, which is near Bloomington, and where the offices, books and officers of the companies were. Before appellee reached Bloomington appellants Wickert, Nafziger, Oehler and Otto met with Lloyd at the latter's office and planned to meet appellee at the train and take him to Lloyd's home in Bloomington. They arrived at the

residence about two o'clock. Appellants then commenced to induce appellee to buy the shares of stock of appellants in the Minier Company. Walters and Lloyd were present and it is contended that one or more of the six men were working on him continuously until after midnight except for an intermission when they went down town for supper, and that they stayed with him during the supper hour, at the same table, except for 10 or 15 minutes when he left them to attend to some private business. Appellee Schroeder was told, as he insists, that his son-in-law, Bird, was guilty of shortages during his management of the Schroeder Company, and also that Bird had been guilty of criminally false representations as to the value of the stock in the Minier Company purchased by the appellants Wickert, Walters, Oehler, Nafziger and Otto. Appellee insists he was told repeatedly that unless he purchased the stock of the said five parties in the Minier Company at the price they had paid for it, plus 7 per cent interest, they would go to Pekin, the county seat of Tazewell county, the next morning and have Bird arrested and sent to the penitentiary, which would disgrace appellee's family and break the hearts of his wife and daughter; that appellee was shown the examination and report of the affairs of the two companies made by Lloyd, who pretended to be a certified public accountant, and which contained statements of certain alleged shortages, namely, "bank shortage," $336.04; "file account shortage," $279.24; "cash shortage," $20.75; "taken from cash for local sales," $123.94; "over credit on salary," $500; and that appellee was told that these shortages as well as the representations regarding the value of the stock would be used as the basis of the criminal prosecution against Bird. It was undisputed on the trial that appellee believed that those shortages existed and various of the appellants testified on the trial that they believed the shortages existed and that they relied upon the

Schroeder v. Otto et al., 240 Ill. App. 567.

correctness of Lloyd's report. At this meeting in Bloomington Lloyd brought in what he called a "line-up," consisting of various interests in the two companies and substantially as follows:

Various interests in Minier Mfg. Co.

1. Stuart Walters
   27 shares at $150.........$ 4,050.00
   Int. 7% to 8-1-22.........   448.87    $ 4,498.87

2. E. W. Wickert
   7 shares at $150..........$ 1,050.00
   Int. 7% to 8-1-22.........   116.37      1,166.37

3. Dan Otto
   34 shares at $175.........$ 5,950.00
   Int. 7% to 8-1-22......... 1,023.85      6,973.85

4. W. F. Oehler
   33 shares at $175.........$ 5,775.00
   Int. 7% to 8-1-22.........   993.79      6,768.79

5. W. H. Nafziger
   33 shares at $175.........$ 5,775.00
   Int. 7% to 8-1-22.........   993.79      6,768.79

                                         $26,226.00

6. H. V. S. Mfg. Co.
   Gen. Ledger ..............$ 1,842.95
   Sales Ledger .............   890.75
   Bal. on Note .............   686.27
   Bank Shortage ...........   336.04
   File Acct. Shortage.......   279.24
   Cash Shortage ...........    20.75
   Taken from Cash for local
      sales .................   123.94
   Over credit salary........   500.00

| | |
|---|---|
| Int. to 8-1-22.............$ | 20.42 |
| Omaha Branch .......... | 3,625.10 |
| Int. 1 year.............. | 253.75 |
| Electric Fan ............ | 32.50 |
| Straw Spreaders ........ | 5,000.00 |

$13,611.71

Brought forward ........$13,611.71
Deduct Credits
   Gen. Ledger.$  380.48
   Sales  ......  3,939.29
   Ford Car...   116.50    $ 4,436.27

                                              $ 9,175.44

Net Claims ..........................$35,352.11

H. V. Schroeder's individual interest in
1.  H. V. S. Mfg. Co.

| | |
|---|---|
| Gen. ledger .............$ | 1,639.76 |
| Salary to 8-1-22.......... | 583.34 |
| Note ..................... | 4,000.00 |
| Int. to 8-1-22............. | 163.33 |
| Note .................... | 1,500.00 |
| Int. to 8-1-22............. | 61.25 |
| Note ..................... | 6,000.00 |
| Int. to 8-1-22............. | 157.50 |

$14,105.18
Less Charges ............    31.53

Net Credit ..............$14,073.65

2.  Wm. F. Oehler
Note ...................$ 6,630.31
6% Int. to 1-1-21..........    795.64

$ 7,425.95

1-1-21 Paid ..............$ 4,870.08

$ 2,555.87
7% Int. to 8-1-22.........   283.28

Net Credit ..............$ 2,839.15

3. A. H. Nafziger
   Note ................·........$12,000.00
   7% Int. to 8-1-22..........   490.00

Net Credit ...............$12,490.00

Recapitulation

1. H. V. S. Mfg. Co. ........$14,073.65
2. Wm. F. Oehler...........  2,839.15
3. A. H. Nafziger..........  12,490.00

Total Credits....$29,402.80
                  14,181.60

$43,589.40
 1,276.29

$     0.69

Appellee Schroeder testifies that he never did understand it and some of appellants testify that they did not understand it. Appellee testifies: Lloyd and some of the appellants insisted that appellee purchase the stock of appellants that night or they would proceed in the morning to have Bird prosecuted criminally, and finally appellee consented to purchase the stock; that he first asked appellants to defer the matter until morning and until he could go over to Minier, but upon

their refusal an attorney was sent for to draft a contract. One of the appellants went to the business district in Bloomington and procured a typewriter and a contract was drafted and signed as follows:

"This agreement, made and entered into by and between H. V. Schroeder, individually, and the Minier Manufacturing Company, by H. V. Schroeder, president, parties of the first part, and Stuart Walters, E. W. Wickert, Daniel Otto, Wm. F. Oehler, A. H. Nafziger, the H. V. Schroeder Manufacturing Company by Daniel Otto, vice president, parties of the second part, each contracting for himself or itself and guaranteeing the authority under which they sign and accept the signature upon the part of any other to this agreement.

"Witnesseth: That whereas the various individuals signing this agreement are stockholders of the H. V. Schroeder Manufacturing Company of Minier, Illinois, and the Minier Manufacturing Company of Minier.

"And whereas it is the desire of the individual parties of the second part to sever their connections with the Minier Manufacturing Company, and it is the desire of the said H. V. Schroeder, party of the first part, to purchase the shares of stock in said company so held by said individuals of the second part; and whereas, it is the desire of all of the parties hereto, including the two corporations named, to settle and adjust all differences between the two said companies, it is therefore agreed as follows:

"The parties of the second part sell and agree to transfer to the said H. V. Schroeder their shares of stock in the Minier Manufacturing Company as follows:

"Stuart Walters, twenty-seven shares;

"E. W. Wickert, seven shares;

"Daniel Otto, thirty-four shares;

"Wm. F. Oehler, thirty-three shares;

"A. H. Nafziger, thirty-three shares.

"And upon the part of said Minier Manufacturing Company it is agreed that upon a full and complete settlement of all account that there is a balance in favor of the H. V. Schroeder Company of $4,175.44, after allowing all just credits and set-offs and after disposing of the controversy between said companies concerning certain straw spreaders by dividing all of said straw spreaders equally between said two companies without any charge or credit to either of said companies, which said division it is agreed by the parties hereto shall be made as full settlement of said matter.

"And the said H. V. Schroeder agrees upon his part that he will pay for the said shares of stock so purchased by him as follows, that is to say: He releases and surrenders to the H. V. Schroeder Company all claims of any kind and character which he holds against said company, whether the same be represented by open accounts, notes or otherwise, except one note for $6,000.00 known as the Blackburn note; said Schroeder does agree to release and does release the said Wm. F. Oehler from any liability which he may have by virtue of a certain note for $6,630.31 given by said Oehler to said Schroeder, and upon which there is now owing approximately $2,839.15; said Schroeder also releases the said A. H. Nafziger from liability upon two certain notes, aggregating $6,000.00, being a part of a certain series of notes for $12,000.00, given by said Nafziger to said Schroeder; also from all liability on one other certain note now aggregating approximately $14,181.00, given by said Nafziger to said Schroeder, and the Schroeder Manufacturing Company agrees to settle and adjust the differences between itself and the Minier Company, as hereinbefore set out in the agreement of said Minier Manufacturing Company.

"The H. V. Schroeder Manufacturing Company agrees as a part of this agreement that it will execute

and deliver its promissory note to H. V. Schroeder in the sum of $5,000.00, dated this date and due March 1st, 1923, interest at 7 per cent per annum, with privilege to renew for a period of one year.

"It is further understood and agreed by all parties hereto that any or all claims which the parties hereto have or may have had, if any, against C. W. Bird are hereby fully released and discharged.

"It is further agreed by all of the individuals signing hereto that said corporations will fully and completely carry out the agreements made on their behalf by the parties hereto who are officers therein.

"Witness our hands and seals this 7th day of August, 1922.

> "Minier Manufacturing Co.
> "By  H. V. Schroeder, Pres.   (Seal)
> "and H. V. Schroeder           (Seal)
> "Schroeder Manufacturing Co.
> "1  Daniel Otto, Vice-Pres.,
> "2  Daniel Otto,
> "3  Wm. F. Oehler,
> "4  A. H. Nafziger,
> "5  Stuart Walters,
> "6  E. W. Wickert."

The next day appellee Schroeder went to Minier and for the first time as he testifies secured information as to much of the matter about which they had contracted. He consulted Bird and at once notified appellants that he would not be bound by the terms of the contract, and later formal written notice was served upon all of the parties interested to that effect. Appellee secured an audit to be made of both companies by The American Audit Company and it was found that the examinations made by Lloyd were not correct and that the supposed shortages did not exist. It was further found that there were mistakes or misrepresentations in the "line-up" with reference to the

amount due on certain notes to be surrendered by appellee under it.

Appellee filed his bill and later his amended bill to cover the issues of fraud or mistake with reference to the representations regarding alleged shortages, the value of the notes to be surrendered by appellee and also to cover a mistake or misrepresentation as to the price at which the 134 shares of the Minier Company stock was put in the contract. There were answers and replications and the Minier Company filed its cross bill praying that the said contract be set aside and canceled so far as that corporation was concerned and for an accounting with the Schroeder Company. The cause was referred to the master in chancery to take the proofs and report the same, together with his conclusions of law and fact. In this statement we have omitted many matters of detail and have set out the more salient facts only. The court entered a decree approving the master's report and set aside the contract under the original amended bill of appellee Schroeder, sustained the cross bill and set aside the contract as to the Minier Company. But as to the accounting prayed for, the master's report and the decree find that the evidence introduced in relation thereto is so indefinite that no figures can be ascertained with a degree of certainty sufficient to fully adjust the respective rights between said corporations. Due objections were made to the master's report, which were made exceptions before the chancellor, and appellants have brought the record to this court for review. Appellee, the Minier Company, has presented no cross error on the question of accounting, so that that question is not before the court, and the decree stands as to all parties that the matter of account between the corporations, upon the evidence, is so indefinite that no figures can be ascertained with a degree of certainty sufficient to fully adjust the respective rights of the corporations.

The master found that each of the parties to the contract had separate and distinct interests, two of the parties being corporations and six of the parties being individuals; that the corporate and individual interests were so interwoven as not to be intelligently severable; that appellee Schroeder, as president of the Minier Company, and Daniel Otto, as president of the Schroeder Company, without any authorization from the several board of directors were incapacitated in law from contracting as officers of said corporations for their own benefit; that appellee Schroeder, as director and president, occupied a trust relation towards all the stockholders of the Minier Company, and that he was bound to act in the interest of said company; that the execution of said contract by said appellee Schroeder in behalf of the Minier Company was not to the best interests of said Minier Company, and that said contract should, therefore, be set aside.

Appellants contend that they do not discuss the question suggested by counsel for the Minier Company as to the rights of individuals to deal with corporations in which they are officers for two reasons: First, that upon a proper accounting between the Schroeder Company and the Minier Company the finding would have to be that the settlement effected by Schroeder on behalf of the Minier Company with the Schroeder Company was a just and equitable one and one that would not be disturbed; and second, that appellee Schroeder certainly has no standing in court to assert that he had no authority to make the contract, particularly in view of his express contract that he did have, and that, therefore, this point will be unavailing to him, and if that were the only question raised it would not prevent the original bill of appellee Schroeder from being dismissed for want of equity. Counsel add: "If the original bill is dismissed we do not much concern ourselves about what happens to the cross bill."

In other words counsel for appellants abandon their assignment of error that the court erred in not finding that the equities of the cause were with the cross defendants and in its decree dismissing the cross bill for want of equity. Counsel do not argue this assignment of error. The decree finds on the cross bill that the parties to the contract had separate and distinct interests, affirming the recital in the master's report, as herein set out, and that said contract should, therefore, be set aside and the decree directed that the contract should be set aside and held for naught.

As to that part of the decree entered upon the cross bill finding the contract invalid as to the Minier Company and setting the same aside, it is conceded that appellee Schroeder was a mere agent or trustee of the Minier Company, without authority to adjust its affairs with the Schroeder Company, and that he has entered into a contract in which the agent or trustee's affairs were mixed and commingled and in which the agent or trustee has a personal interest, and that he has entered into a contract purporting to bind his principal or *cestui que trust,* the Minier Company, to pay certain items of indebtedness, as herein recited, claimed to be owing by Bird individually to the Schroeder Company. It is not even contended that the Minier Company was indebted to anyone for Bird's shortages to and overdrafts upon the Schroeder Company, if such claims are recognized as just. The contract also establishes or purports to establish an indebtedness of $4,175.44 against the Minier Company and in favor of the Schroeder Company as part consideration for appellee Schroeder's individual purchase of shares of stock in the Minier Company, no part of which was to be paid to the vendors of the stock, but various individual and corporation claims were to be released and canceled and new claims established between the corporations in order that the individuals on both sides might buy and sell shares of

stock to each other individually, while acting as agents
and trustees of the respective corporations. This the
law does not permit them to do in any case without
authority, whether the transaction is fair and equitable
or otherwise. *Higgins v. Lansingh,* 154 Ill. 301; *Klein
v. Independent Brewing Ass'n,* 231 Ill. 594; *Bingham
v. Bell & Zoller Coal Co.,* 175 Ill. App. 469; *Thomas v.
Brownville, Fort Kearney & Pacific R. Co.,* 109 U. S.
522, 27 L. Ed. 1018.

In *Higgins v. Lansingh, supra,* on page 364, the
court said: "Morawetz, in his treatise on Private
Corporations, (vol. 1, sec. 517,) says: 'The directors
or trustees of a corporation, in accepting their ap-
pointment to office, impliedly undertake to give the
company the benefit of their best care and judgment,
and to use the powers thus conferred upon them solely
in the interest of the corporation. They have no right,
under any circumstances, to use their official positions
for their own benefit or the benefit of any one except
the corporation itself. It is for this reason that the
directors have no authority to represent the corpora-
tion in any transaction in which they are personally
interested, in obtaining an advantage at the expense
of the company. * * * Accordingly it has been
held in numerous cases that the directors of a corpo-
ration have no authority to bind the company to any
contract made with themselves personally, or to repre-
sent it in any transaction with third persons in which
they have a private interest at stake.' He further
says: 'The right of the principal to refuse to be
bound by a transaction in which the agent assuming
to represent him has an adverse interest is uncondi-
tional. It is immaterial whether the transaction was
fair or not. * * * In many cases it would be im-
possible to ascertain whether the agent did or did not
obtain the best terms for the principal which it was
possible to obtain.' (1 Morawetz, sec. 522; 1 Beach
on Private Corp. sec. 243.) It was also so held by

this court in *Gilman, C. & S. R. Co. v. Kelly,* 77 Ill. 426.''

In *Klein v. Independent Brewing Ass'n, supra,* the court held on page 610: ''Appellees insist that they acted in good faith in purchasing the property, and while they practically admit they may have paid something more than the market value for some of it, they claim it was worth to the corporation, for the purposes they bought it for, all that was paid for it. In *Higgins v. Lansingh,* 154 Ill. 301, after a review of cases relating to dealings of directors with the corporation, it was said (p. 367): 'It was further said, that during the solvency of the corporation the directors are the agents or trustees of the stockholders; and in *Harts v. Brown,* 77 Ill. 226, it was said that a director, in so dealing, must act fairly and be free from all fraud and oppression, and must act for the interest of the company and impose no unfair or unreasonable terms. But it has not been held that the company or its stockholders may not avoid a contract requiring the action of the board of directors to make it, whether made in good faith or not, where so many of the directors are interested in the contract adversely to the company that the company is not represented by a disinterested majority of the directors voting. On the contrary, it is held that the directors, without the sanction of the stockholders, have no power to contract, for the corporation, with themselves or for the benefit of themselves, and if they attempt to do so the contract may be avoided by the corporation or its stockholders not consenting, whether the contract appears to be fair and just or not.' ''

In *Bingham v. Bell & Zoller Coal Co., supra* (p. 476) the court, citing from another phase of the *Higgins* case, said: '' 'In *Beach v. Miller,* 130 Ill. 162, *Roseboom v. Whittaker,* 132 Ill. 81, and in *Mullanphy Sav. Bank v. Schott,* 135 Ill. 655, it was said by this court that so long as a corporation remains solvent, its

directors may, with knowledge of its stockholders, deal with it, loan it money, take security or buy property of it, the same as a stranger may. It was further said, that during the solvency of the corporation the directors are the agents or trustees of the stockholders; and in *Harts v. Brown,* 77 Ill. 226, it was said that a director, in so dealing, must act fairly, and be free from all fraud and oppression, and must act for the interest of the company, and impose no unfair or unreasonable terms. But it has not been held that the company or its stockholders may not avoid a contract requiring the action of the board of directors to make it, whether made in good faith or not, where so many of the directors are interested in the contract adversely to the company that the company is not represented by a disinterested majority of the directors voting. On the contrary, it is held that the directors, without the sanction of the stockholders, have no power to contract, for the corporation, with themselves or for the benefit of themselves, and if they attempt to do so the contract may be avoided by the corporation or its stockholders not consenting, whether the contract appears to be fair and just or not.' Citing *Gilman, C. & S. R. Co. v. Kelly,* 77 Ill. 426, and *Chicago Hansom Cab Co. v. Yerkes,* 141 Ill. 320.''

Neither of the corporations in the case at bar were represented by a majority of its board of directors not interested individually in the terms and proceeds of the contract. Bird owned a majority of the stock in the Minier Company and never knew anything about the contract until after it was executed. In fact, the appellants co-operated to bring about the execution of the contract in a manner so that Bird would not know anything about it, and it was conceded that Bird would not have agreed to and did not consent to the terms of the contract. There was no error on the part of the chancellor in holding the contract void as to the Minier Company. This should dispose of the

case as to the original amended bill (*Corcoran v. Lehigh & Franklin Coal Co.*, 138 Ill. 397; *People v. Economy Power Co.*, 241 Ill. 355; and *United States Brewing Co. v. Dolese & Shepard Co.*, 174 Ill. App. 394), except that the contract recites that "each (party) contracting for himself and itself and guaranteeing the authority under which they sign and accept the signature upon the part of any other to this agreement," and it is claimed that the decree should be reversed as to appellee Schroeder on the original bill of complaint.

It was charged in the bill that appellants conspired to secure the contract from appellee and employed Lloyd to assist them in carrying out the conspiracy. It was further charged that appellants and Lloyd misrepresented the condition of the business, the shortages, the nature and value of items and threatened appellee that if the contract was not signed Bird would be prosecuted and sent to the penitentiary; that appellee had no counsel to represent him, and that in signing the contract he relied and depended upon Lloyd's figures and items, many of which were later found to be incorrect and untrue; that a lawyer was gotten out of bed in the middle of the night to come and draft a contract in accordance with appellants' wishes, and that appellee, then being mentally and physically exhausted, and believing that appellants would carry out their threat to prosecute Bird, signed the contract. Later, an amendment was filed to the bill recounting the errors and mistakes in the various matters and the amounts of the various items, and it is alleged that if the appellants then and there believed said statements made by them to be true, said contract was entered into by a mutual mistake of the parties as to the alleged facts represented to be true by said statements, and that appellee is not bound by said contract, and that the consideration thereof has failed. To recount all or any considerable portion of

the testimony would extend this opinion to too great length. Appellants admit that the figures used in Lloyd's ''line-up'' were used in the controversy at Bloomington, but deny that any threats were made to prosecute Bird. Most of the appellants denied that they had had any meeting among themselves previous to the Bloomington meeting, or that they had any previous arrangement as to the form of settlement. Still, they entered into a very peculiar contract if they had had no previous arrangement, as to the form of settlement. It was agreed in the contract that any or all claims which the parties to the contract had, if any, against C. W. Bird, ''are hereby fully released and discharged,'' and appellants Walters, Wickert, Otto and Oehler agreed to sell and transfer 101 shares of stock in the Minier Company to appellee Schroeder, said shares, with interest, set out in the ''line-up'' at a valuation of $19,407.88, and no one agreed in any manner to pay either of them anything for said stock. All of the consideration therefor was to accrue to Nafziger and Oehler or to the Schroeder Company. It is legal for persons to contract in that manner, but most unusual. Lloyd testified on the trial that there was no affirmative testimony that Bird had committed any embezzlements. He did, however, insist that there was negative testimony of Bird's embezzlements in each item of the shortages where he could not make the books of the Schroeder Company balance. Upon the examination made of the books, after the execution of the contract, by a certified public accountant, all of the shortages mentioned were accounted for by errors in bookkeeping and clerical errors, and it was found that the company had lost nothing by the alleged shortages. The question of Bird's overdraft on salary with the Schroeder Company was testified to by Bird and it was undisputed that he had stated to appellants numerous times that he would settle that in court any time they wanted to

bring suit. Bird was not a party to this suit and he had a right to have it submitted to the courts. Miss Ewing had been the bookkeeper of both concerns and looked after the cash and bank accounts during the time it was claimed the shortages occurred, and upon the trial of the cause Lloyd, Egan and Miss Ewing all testified in regard to these matters. It is not now claimed by appellants that there were any shortages growing out of dishonest conduct or any arising except by error or mistake, and Egan claims to have accounted for nearly all of the errors and mistakes. Appellants insist that nowhere in Lloyd's report will it be found that he ever claimed, nor that it is found anywhere in the testimony of any of the appellants that they claim any of these shortages represented money wrongfully taken or stolen from the Schroeder Company, and appellants insist that the reports are not subject to that interpretation. The "line-up" was taken from the reports and our inquiry is to find the reason why Lloyd included these items in the "line-up," and why appellants insisted upon appellee Schroeder making them good. It may be some corroboration of appellee's bill of complaint and testimony that Bird was threatened with criminal prosecution.

On or about August 1, 1922, Lloyd made a report to Messrs. Dan Otto, William Oehler, Albert Nafziger and E. W. Wickert, appellants, dated August 1, 1922, in which he prefaces: "In examining the books of accounts of the Minier Manufacturing Company, in accordance with your instructions we have kept always in mind your personal interests, rather than the interests of the company *per se*." A great many exhibits are attached, showing different phases of the business, inventories and stock ledger accounts from all of which the "line-up" is made up. Near the end of this report Lloyd states: "Your claims are of sufficient size and importance to be pressed to the limit

of the law, but we hope our plan submitted herewith
for an amicable settlement and adjustment of exist-
ing differences will be most seriously considered by
all interests." At the end of the report Lloyd certifies
that "the foregoing statements are true and repre-
sent real facts as discovered by us, and that the ex-
hibits attached are true copies and that the report as
a whole is intended to reflect the real conditions to
our best knowledge and belief." This report and the
exhibits are in evidence and settle the question that
Lloyd, all through this matter, acted as the agent of
appellants and vouched for the truth of the statement,
figures and condition of affairs set out in the report
and exhibits. We are led to inquire what claims of
appellants Lloyd had in mind which were of such size
and importance that they should be pressed to the
limit of the law. Appellants contend that the claims
for "shortages" against Bird were not pressed at the
Bloomington meeting, but it is insisted by appellants
that Bird did make serious misrepresentations to in-
duce "these men" to buy stock in the Minier Com-
pany. Otto testifies that the stock he purchased in
the Minier Company was purchased from S. E.
Schroeder and purchased through Bird. Oehler tes-
tifies that the stock he purchased in the Minier Com-
pany was Simon Schroeder's stock and that Bird
really made the deal. He further states that he talked
with appellee Schroeder about the purchase twice, and
that appellee "seemed to think it would be all right
for us to buy it." Nafziger testifies that he purchased
33 shares of stock in the Minier Company in the spring
of 1920 from appellee Schroeder and from Bird, and
paid them $175 per share for it. Nafziger further tes-
tified as to the purchase of this stock and the meeting
at Bloomington August 7, 1922, as follows: "We all
told Mr. Schroeder on August 7th that there had been
misrepresentations about the selling of the stock. I
don't know that we told him more than once. We all

talked. We told him this before we went to supper, not afterwards. We said that Mr. Bird, his son-in-law, misrepresented the stock. I don't know that we all told him that, but we all claimed that he had misrepresented it. We did not say that Bird obtained our money by false pretenses, but that we had parted with our money because of his misrepresentations. All of this talk about shortages was before the contract was signed. When I got my stock I gave a note to Mr. Schroeder for thirty-three shares at $175 a share and afterwards paid the note by borrowing the money at the bank."

The stock of Wickert and Walters in the Minier Company, as purchased, has been set out and was repurchased by Bird and the most of it again purchased by Wickert and Walters in the fall of 1920. Lloyd, in his first exhibit to the report, shows the assets of the Minier Company on November 1, 1920, and its liabilities; that it was a corporation having $50,000 capital stock and net assets of $76,716.21. The only charge of fraud on Bird's part in this matter was the statement of earnings in the last four months in 1919, which has been adverted to. Appellants, in their answer, deny that at the meeting in Bloomington they charged Bird had made any criminal false representations to some of them to induce them to buy stock in the Minier Company. No action of any kind has ever been taken by any of the appellants to rescind any of these purchases of stock and no claim is made that appellee made any representations as to the stock which were false or misleading to appellants, or any of them, and this should exclude from all legal phases of the case any intimations of fraud made on the part of appellee.

In the contract as made, it was testified to by appellee and by appellants Oehler, Nafziger and Otto that at the meeting in Bloomington appellee was to purchase their stock in the Minier Company at $150 per

share, the same price that appellee was to pay to Walters and Wickert. Nevertheless, in writing the contract and adjusting the figures the stock of appellants Oehler, Nafziger and Otto is figured in at $175 per share, making a total charge of $3,159 that appellee is required to pay for said stock, according to the terms of the contract, over the price agreed upon between the parties. This is shown by appellants' exhibit 6, being Lloyd's "Interpretation of the Contract." It is further shown by the exhibit that appellee was compelled to pay, by reason of the added price, an additional sum of $709.17 as interest, which was not discussed during the negotiations and which entered into the contract without the knowledge of appellee. We submit appellants' exhibit 6:

"Sundry Interests in Minier Mfg. Co.

"1    S. Walters
      "27 shares at 150 . . . . . . . .$ 4,050.00
      "Int. 7₁% to 8-1-22 . . . . . . .    448.87      $ 4,498.87

"2    E. W. Wickert
      "7 shares at 150 . . . . . . . . .$ 1,050.00
      "Int. 7₁% to 8-1-22 . . . . . . . .    116.37      1,166.37

"3    Dan Otto
      "34 shares at 175 . . . . . . . .$ 5,959.00
      "Int. 7% to 8-1-22 . . . . . . .   1,023.85      6,973.85

"4    Wm. F. Oehler
      "34 shares at 175 . . . . . . . .$ 5,775.00
      "Int. 7₁% to 8-1-22 . . . .∴. .    993.79      6,768.79

"5    A. H. Nafziger
      "33 shares at 175 . . . . . . . .$ 5,775.00
      "Int. 7₁% to 8-1-22 . . . . . . . .    993.79      6,768.79

"6    H. V. S. Mfg. Co.
      "Undisputed items
      "Gen. Ledger . . . . . . . . .,. .$ 1,842.95

```
"Sales Ledger ...........$    890.75
"Bal. on Note ...........     686.27
"Electric fan  ...........     32.50

        "Total ..........$ 3,452.47
"Disputed items
"Bank shortage .........$    336.04
"File shortage ..........     279.24
"Cash shortage .........      20.75
"Taken from cash for local
     sales ...............     123.94
"Salary over credit......     500.00
"Int. to 8-1-22...........     20.42
"Omaha Branch ........      3,625.10
"Int. One Year..........     253.75

        "Total charges ..$ 8,611.71
"Deduct credits
"Gen. Ledger.$  380.48
"Sales Ledger 3,939.20
"Ford Car  ..   116.50
            ——————      4,436.27

"Net Amt. of Co. Claim..$ 4,175.44

"Total Claims  ..........$30,352.11
"H. V. Schroeder's individual
     interests in
"1   H. V. S. Mfg. Co.
"Gen. Ledger ...........$ 1,639.76
"Salary to 8-1-22........     583.34
"Note .................     4,000.00
"Int. to 8-1-22...........     163.33
"Note ..................     1,500.00
"Int. to 8-1-22...........      61.25

                          $ 7,947.68
"Deduct charges .........      31.53

        "Net credit .....$ 7,916.15
```

"2    Wm. F. Oehler
    "Note ..................$ 6,630.31
    "Int. 6% to 1-1-21.......    795.64

                     $ 7,425.95
    "1-1-21 Paid ............    4,870.08

                     $ 2,555.87
    "Int. 7% to 8-1-22.......    283.28
          "Net credit .....$ 2,839.15
"3    A. H. Nafziger
    "Note ..................$ 6,000.00
    "Int. 7% to 8-1-22.......    245.00

        "Credit a .......$ 6,245.00
    "Note ..................$14,181.60
    "Int. 6% to 3-1-21........    992.71

                    $15,174.31
    "Payment 3-1-22........    700.00

                    $14,474.31
    "Int. to 8-1-22..........    361.86

        "Credit b  ......$14,836.17

        "Recapitulation
"1.   H. V. S. Mfg. Co. .......$ 7,916.15
"2.   W. F. Oehler...........    2,839.15
"3.   Nafziger a .............    6,245.00
          b .............    14,836.17

                    $31,836.47
    "Variation intangibles ...    850.10

    "Total credit agreed on..$32,686.57
    "New note given 8-8-22...    5,000.00

    "Amount of credit traded.$27,686.57

The items, "bank shortage, $336.04, file account shortage, $279.24, cash shortage, $20.75, taken from

cash for local sales, $123.94, over credit salary, $500.00, interest to August 1, 1922, $20.42, and over-charge on electric fan, $11.25,'' amounting to $1,-291.64, are substantially items charged in the contract to the Minier Company, which the testimony shows that company did not owe, and it is insisted that these items were included in the contract either by a mutual mistake of the parties or by fraud.

For the item $3,625.10 for loss on the Omaha Branch, which was used by both parties, there is no charge on the books of the Schroeder Company against the Minier Company, and it is insisted that even if said item is an equitable division of said loss there is no possible legal foundation for making the charge of interest of $253.75. It was found after the contract was executed that the Schroeder Company had borrowed machinery of the Minier Company, of the value of $1,400, of which appellee had no knowledge and which was claimed by the Schroeder Company under the terms of said contract. The Minier Company was charged $32.50 for a fan which it had borrowed from the Schroeder Company, and it is insisted that the machinery item should have been charged in the same manner. It is undisputed that in the spring of 1920 the Minier Company sold to the Schroeder Company 250 spreaders for $45 each, 139 of which were fully completed and the remainder the Minier Company was to furnish the material and pay the Schroeder Company for completing the construction. The Schroeder Company entered into the possession of these spreaders and stored them in a barn. The item amounts to $11,250 less some reduction for the cost of completing the machines. Under the terms of the contract the two companies were to divide the machines which had never been sold. This is claimed as a fraud upon the Minier Company.

Appellants state in their brief that the master's report is in error in showing that Lloyd's reports

showed that the Minier Company was indebted to the Schroeder Company in the sum of $4,175.44. In the "line-up" it is shown that the Schroeder Company had claims (item 6) against the Minier Company to the amount of $9,175.44, and it is pointed out that $5,000 had been deducted from this item on the spreader account, leaving a balance of $4,175.44, which would make an added error of $5,000 in the contract that the Minier Company was deprived of either by fraud or mutual mistake of the parties. Altogether it is pointed out and brought to the attention of the court that in the items mentioned and in other items the terms of the written contract, under the testimony produced, deprive the Minier Company and appellee of over the sum of $15,000, in accounts, notes and property, in addition to appellee's agreement to purchase stock at $150 per share, which, at the time the contract was entered into, had a value not greater than $68 per share, and that this result was brought about by threats of appellants to prosecute Bird criminally, or upon representations of the appellants known by them to be false and untrue, or by the mutual mistake of the parties.

It is pointed out that several of the appellants' witnesses have been impeached, some of them by appellants' witnesses. Lloyd testified that he knew nothing about the Nafziger note of $14,181 until it was mentioned on August 7, 1922. The note was referred to in his written report made prior to that date. He was also contradicted in material matters by the witnesses McLaughlin, Egan and Ewing. Nafziger was impeached by Duback who testified that Nafziger admitted to him that the Schroeder Company had bought the straw spreaders at a price which would enable them to keep their factory running and give the men work. Nafziger denied positively having had any meeting at Bloomington prior to August 7 with Lloyd and other appellants. Lloyd admitted having such a

meeting and stated that Nafziger was there. Nafziger testified he purchased stock in the Minier Company from appellee. The records showed he purchased the stock from Simon Schroeder. He was also contradicted by Duback and by other documentary evidence. Oehler denied the Bloomington meeting prior to August 7. He also testified that no complete spreaders were moved; that he could not remember that the Schroeder Company ever took over from the Minier Company any material for end gates. He stated that the borrowed Gilson engine had no value and he stated that on August 7 none of the appellants mentioned Bird to the appellee, in all of which statements he was contradicted and in several matters impeached by his associates. Appellant Walters testified that on August 7 appellee did not mention waiting until the next day to sign the contract. In this he was impeached by Oehler and Lloyd. Appellant Otto denied attending the Bloomington meeting prior to August 7 and that appellee asked to defer signing the contract until the next day. He was contradicted by his associates. Otto testified that he made arrangements, as vice-president of the Minier Company, to rent the Bradley barn in which to store the straw spreaders, and that he did not know who paid the rent on the barn. He was contradicted by Bradley who testified he rented the barn to the Schroeder Company, and by Miss Ewing, who testified that Otto instructed her to pay the rent out of the moneys of the Schroeder Company. In other material matters appellants' witnesses were contradicted and impeached. In addition, all of the appellants, including Lloyd, testified that at the time the contract was signed nothing had been said directly or indirectly as to how those selling stock to appellee were to be reimbursed. Under the contract, Oehler put in 33 shares of stock and all he received was his note upon which there was due $2,839.15. The contract did not state how he was to be paid the difference.

Under the contract, Walters, Wickert and Otto sold their stock to appellee and the contract provided for no recompense to them. Appellants testified that the contract was signed and the parties dispersed without any mention having been made by anyone as to how the various appellants were to be paid. They were later paid by receiving notes (or the promise of notes which were left in the office of the Schroeder Company) from Nafziger, but they claimed that he did not know when he signed the contract whether he could settle with them in notes or in cash. Lloyd states that the "line-up" was written on August 1, 1922, and shown to appellants at that time. The appellants were with Lloyd on the forenoon of August 7, 1922, before the arrival of appellee and Walters. It seems impossible to believe that these parties (appellants) did not have a common understanding as to how the matter was to be handled prior to the meeting in Bloomington. At the time the contract was signed, appellant Walters owned no shares of stock in the Minier Company. The 27 shares had been transferred to his wife.

We have set out the salient points in this case. The record is very large and the figures voluminous, and to say that even the statement made is free from error would be most presumptuous. We have studied Lloyd's "line-up" and his "interpretation of the contract," and compared these documents with the inventories and the testimony, and it excites no criticism that some of the appellants were not able to understand these figures or all of them, and that appellee may have become bewildered in their mass on August 7, 1922. We have undertaken no demonstration and will not attempt to strike an accurate or exact balance in these accounts. We can sympathize with the master and the chancellor in not undertaking an accounting in this case, although the failure is very unfortunate for the litigants. Appellee was a strong, active business man and in the prime of life. There is no

testimony showing that he gave attention to details or in any manner was conversant with the bookkeeping or concerned about items in the business. The appellants all had confidence in appellee and desired to retain his influence and force in the Schroeder Company and had objected to accepting his stock in the Schroeder Company for their stock in the Minier Company. The testimony also shows that appellee was interested in relieving appellants' situation in connection with Bird and the Minier Company, and was willing to take upon his own shoulders a part of the serious losses and setbacks that appellants had suffered by the unfortunate slump and depression in the late fall of 1920 and in 1921. Appellee was willing to purchase appellants' stock in the Minier Company at $150 per share at a time when this stock was not worth over $68 per share. Appellee was not legally compelled to relieve them, but he recognized the moral obligation of assisting those in a time of need who had been his associates and had assisted him in business. In doing this appellee was entitled to know and have before him the exact and true condition of the business, the interests of both companies and the exact state of the accounts.

With reference to the charge of fraud and threats in the bill of complaint made by appellants to appellee, counsel indulge in considerable argument as to appellee's age, business acumen and ability to protect himself in such a business transaction, and the inference is that if appellee's charges were true, appellee was guilty of negligence. This is not the law as to the false representation of material facts. It was held in *Kehl v. Abram,* 210 Ill. 224: "In *Linington v. Strong,* 107 Ill. 295, we said (p. 303) : 'As between the original parties to the transaction, we consider that where it appears that one party has been guilty of an intentional and deliberate fraud, by which, to his knowledge, the other party has been misled or influenced in

his action, he cannot escape the legal consequences of his fraudulent conduct by saying that the fraud might have been discovered had the party whom he deceived exercised reasonable diligence and care.' And also in *Antle v. Sexton,* 137 Ill. 410, it was said (p. 413): 'Where a misrepresentation is made as to a material fact, and such misrepresentation is made knowingly and for the express purpose of deceiving and defrauding, and the party injured relies upon the statement made and under circumstances which would induce a reasonably prudent man to so rely, there must be a right of action at law for fraud and deceit.'"

It is further insisted by appellants that threats of criminal prosecution do not constitute duress when no proceeding has been commenced and no warrant issued, citing: *Rendleman v. Rendleman,* 156 Ill. 568; *Hintz v. Hintz,* 222 Ill. 252, and *Huston v. Smith,* 248 Ill. 402. The facts in those cases are not the same as the facts in the case at bar. In *Kronmeyer v. Buck,* 258 Ill. 586, the facts are similar to the facts charged in this case. Kronmeyer was an employee of Buck, and Buck accused him of embezzling funds and threatened to have him arrested. No legal proceedings were instituted. Kronmeyer was alarmed and went to his sister, Mrs. Staehle, and induced her to sign a note for $1,500 which he delivered to Buck. Buck did not interview Mrs. Staehle but Kronmeyer said to her: "Sign this note; Buck accuses me of stealing from him and if I don't get this note signed I will have to go to jail." Kronmeyer also deeded some real estate to Buck to settle his alleged shortage.

In a chancery proceeding to set aside the note and deed, like the proceedings in the present case, the court found that there was no convincing evidence of embezzlement; that there was evidence tending to show that Kronmeyer owed Buck $17, though it was not conclusive; that there was no promise of immunity made, yet there was an implied promise that Kron-

meyer would not have to go to jail or be prosecuted. The court said (page 595): "We have no hesitation whatever in holding that the execution of the note by Mrs. Staehle was procured by duress. She was an innocent third party. There can be no pretense that she was indebted to Buck in any amount. The first intimation that she had of any trouble was when her brother approached her in a highly excited manner and told her Buck claimed he had been stealing from him and that unless he got this note executed he would have to go to jail. She signed the note to keep her brother from going to jail and under the belief that if she did sign it he would be saved from imprisonment and prosecution. It is but natural that she would cling to her brother and seek to aid him in his trouble under the pressure of his importunities, which were not rendered the less forceful and overpowering by the presence of McNaughton. Mrs. Staehle testifies that the only reason she executed the note was to save her brother from the impending prosecution. While no promise of immunity was expressly made, yet it is perfectly clear that both she and Kronmeyer were influenced by the understanding, which was clearly to be implied, that if the matter was adjusted satisfactorily Kronmeyer would not have to go to jail or be prosecuted. *Miller v. Minor Lumber Co.,* 98 Mich. 163, 57 N. E. 101."

The court then discussed the principle of law that it is not duress through threats of prosecution to secure property from one who is, in fact, guilty of misappropriating money. The court said (page 596): "The execution of the note and deed by Kronmeyer stands upon a different footing. Duress is not available as a defense against a note or other instrument executed by one who is, in fact, guilty of misappropriating the money of another, although the execution of the instrument is obtained by threatened prosecution, if the instrument is executed in payment of a

debt honestly due. In such case the law regards the existence of a debt, and not the threatened prosecution, as the consideration. The authorities support the proposition that where a deed or mortgage is executed to secure an amount of money actually due as the result of transactions having a criminal aspect, equity will not set aside such conveyances even though their execution was procured by threats of criminal prosecution.''

The court, however, set aside the deed which Kronmeyer had given Buck, saying (page 597): "But in all these cases where conveyances have been upheld which were executed by a defaulter or embezzler in settlement of his shortage there was no question about the existence of the debt to pay or secure which the conveyance was executed. The case at bar does not fall within the rule of the foregoing authorities, for the reason, as we have already sought to show, the evidence of the existence of the debt is extremely doubtful, and there is no evidence that tends to prove the existence of a debt of more than $17. The evidence in this record shows that McNaughton accused Kronmeyer of embezzlement. Kronmeyer denied the charge. McNaughton told him that he did not expect him to confess his guilt but that he had the proof of his guilt, and exhibited to him certain memoranda, giving dates and amounts, by which he said he was able to prove he had stolen. If Kronmeyer was, in fact, innocent, and, when confronted with a charge of this kind by a lawyer whom he had always regarded as a friend, executed the instruments in question to avoid a prosecution for a crime which he had not committed, then there was both fraud and duress and a total failure of consideration. Upon this hypothesis of fact the case would fall under the rule of *Knotts v. Preble,* 50 Ill. 226. In that case Preble had an insurance on a stock of goods in a store room in Lexington which was totally destroyed by fire. The fire was com-

municated from the Preble building to one occupied by Knotts & Steers, which was consumed, with a loss of several thousand dollars to Knotts & Steers. After the fire Knotts persuaded Preble that he was under obligation to bear a part of their loss; stated that the fire originated from a defective flue in the defendant's building, and said that 'he could prove things about the fire that Preble little thought of.' Under the belief that the plaintiffs had some sort of claim on him, and under the influence of representations made by Knotts, Preble executed a note payable to Knotts & Steers. This court, in sustaining a judgment for the defendant on the ground that there was no consideration, on page 227 said: 'It is no doubt true that a promise made to settle a doubtful right or to get rid of a probable liability is binding and made upon a good and valuable consideration, and it is no defense for the promisor to say he was mistaken in regard to his liability. But this is not such a case. The note was obtained solely by force of these false representations made by Knotts that he could prove Preble was the cause of the fire. Knotts failed to prove any such thing. The facts in connection with the case were fairly left to the jury, and they have said there was no ground whatever on which to base the plaintiffs' claim. This destroys the idea of good faith on plaintiffs' part in making the claims.' ''

The master and the chancellor have found that appellee signed the contract through fraudulent representations, upon which appellee relied and which appellants or their agent, Lloyd, knew to be untrue, and that appellee signed the contract under the threats of appellants, or some of them, that if he did not sign the contract his son-in-law, Bird, would be prosecuted criminally. We have examined the evidence and spent a great deal of time upon this record, and we are not prepared to say that this finding is against the manifest weight of the testimony. To support the decree,

it is not necessary for this court to find that all of the findings of the master and chancellor are supported by the testimony. In a chancery case the facts are found by the court and the master's report, while prima facie correct, is of an advisory nature only. It was held in *Chechik v. Koletsky*, 311 Ill. 438: "All the facts are open for the consideration, in the first instance, of the trial court, and in case of an appeal, by the reviewing court. Without regard to the finding of the master upon any particular question of fact, the ultimate and final question in this court is, Was the decree rendered by the chancellor the proper one under the law and the evidence? *Corbly v. Corbly*, 280 Ill. 278; *Kelly v. Fahrney*, 242 Ill. 240; *Fairbury Agricultural Board v. Holly*, 169 Ill. 9.''

Whether appellee Schroeder signed the contract under the fears of a criminal prosecution threatened to be brought against Bird, we do not consider necessary to determine to uphold the decree. Lloyd was employed by appellants Otto, Oehler, Nafziger and Wickert and by appellee Schroeder to examine the accounts and developed into a strong partisan for the appellants only "to extricate them" from what he was pleased to call their "undesirable contact with Bird," and at appellee's and the Minier Company's expense. Lloyd's testimony shows that he violated the terms of his employment. If appellants did not know the falsity of some of the charges made and relied upon, the report and figures made by Lloyd and the items in said report, and Lloyd's conclusions as to the affairs of said corporations, then the contract was signed under a mutual mistake of facts by both parties and should be set aside. The matters stated and represented by appellants and their agent Lloyd had reference to material facts to be agreed upon by the parties, and it is plain that the contract does not contain the agreement and settlement as understood

by appellee, and if it was understood by appellants, the contract is based upon fraud.

"Mutual consent is requisite to the creation of a contract, and if there is a mistake of fact by one of the parties going to the essence of the contract, no agreement is, in fact, made." 2 Kent's Com. 477; *Steinmeyer v. Schroeppel*, 226 Ill. 13.

It is plain that the cause ought to be remanded to state an account, but it is not within the power of this court, as it has been presented here, to remand the cause.

The decree of the circuit court of Tazewell county is affirmed.

*Affirmed.*

Mr. Justice Niehaus took no part in the consideration or decision of this case.