(No. 35455.—)

HAROLD SHLENSKY *et al.*, Appellants, *vs.* SOUTH PARKWAY BUILDING CORPORATION *et al.*, Appellees.

*Opinion filed March 31, 1960.—Rehearing denied May 20, 1960.*

WILLIAM T. KIRBY, of Chicago, for appellants.

ALBERT E. JENNER, JR., ANAN RAYMOND, THOMAS P. SULLIVAN, and EDWARD L. VOLLERS, all of Chicago, (THOMPSON, RAYMOND, MAYER, JENNER & BLOOMSTEIN, and MILLIKEN, VOLLERS & PARSONS, of counsel,) for appellees.

Mr. JUSTICE BRISTOW delivered the opinion of the court:

Plaintiffs Harold and Max Shlensky, suing on behalf of themselves and other stockholders of the South Parkway Building Corporation, have been allowed by this court to appeal from an Appellate Court judgment reversing the chancellor's decree ordering defendants, as directors of the corporation, to give an accounting for the benefit of the stockholders.

This appeal involves a determination of Illinois law respecting the obligation of corporate directors in trans-

actions between corporations with interlocking directorates, and poses the question whether defendants have infringed this law in any of the challenged transactions.

Although the facts and inferences in this extensive record are controverted, it appears that plaintiffs are minority stockholders, and defendants Englestein, Mackie, Bernstein and Peyla are directors of the South Parkway Building Corporation. (Although the death of defendant Englestein in 1959, during the pendency of this appeal, has been suggested to this court and his executor has been substituted as a proper party herein, Englestein's name has been referred to as though he were still a party defendant, for purposes of simplification.) The main asset of the corporation, and the subject of this controversy, is a 3-story corner commercial building on a lot with a frontage of 289 feet on 47th Street and 400 feet on South Parkway, in Chicago.

A brief review of the history of the property may cast light on the challenged transactions. The building was constructed in 1928 on property owned by Harry Englestein. There was a mortgage foreclosure and reorganization proceedings in the Federal court from 1931 to 1935, during which Harold Townsend was in possession of the property as trustee in bankruptcy, with the legal title held in the South Center Building Corporation. The reorganization was completed in 1935, and under the plan the South Parkway Building Corporation (herein referred to as the Building Corporation) became the legal owner of the premises, and the former bondholders became shareholders of this corporation.

At that time there was in force a five-year lease, executed in 1933 by Townsend as trustee, to the South Center Department Store, hereinafter referred to as the Store, at a fixed rent of $300 per month and certain designated percentage rents based on volume of sales. The Store had occupied space in the building since it was constructed, and

it is undisputed that all of its stock was owned by Engle-stein. In 1936 the Building Corporation executed a new lease to the Store for a term of 10 years, from June 1, 1936, to May 31, 1946, with a fixed rent of $400 per month, and the following percentage rents for the last eight years of the lease: $1\frac{1}{2}\%$ on sales from $600,000 to $800,000; 3% on sales from $800,000 to $1,000,000; and 2% on sales over $1,000,000.

On August 21, 1940, the lease was extended by a supplemental agreement for an additional six years, from June 1, 1946, to May 31, 1952, at the same rental, and with an option for a further four-year extension beyond June 1, 1952, upon terms to be agreed upon in the future. The option was included since Englestein had requested a 10-year extension at that time. However, in 1946 the Store requested, and secured, from the Building Corporation a 15-year extension of its lease on the same terms.

While plaintiffs submitted that the terms of this Store lease, executed at Englestein's request, gave preferential treatment to the Store at the expense of the Building Corporation, plaintiffs' first challenged transaction involved the action of the board of the Building Corporation taken on March 18, 1948. At that meeting Englestein told the board that the Store had made large expenditures for new fixtures, advertising and promotion; that a larger amount of working capital was needed by the Store, and that it was willing to sell to the Building Corporation its old furniture, fixtures and equipment for $100,000. The board of the Building Corporation, composed of Englestein, Mackie, Bernstein, Peyla, Teter and Townsend, thereupon authorized the payment of $100,000 to the Store, and by resolution tied it to certain lease changes to be made in the future. Director Sturm resigned in protest of the purchase. Of the six directors approving the transaction, Bernstein was Engle-stein's attorney and attorney for the Store; Mackie was an employee of various companies in which Englestein has

been interested since 1925, and a director of the Store and of Harry M. Englestein & Company; and Englestein was president, treasurer, director and owner of the Store, as well as director and managing agent of the Building Corporation. Peyla lived and conducted his securities business in Joliet, Illinois, and according to defendants' admission, relied on Englestein for guidance in the conduct of the business of the Building Corporation.

On May 4, 1948, this same board, with the exception of Townsend, who was out of the city at the time and allegedly informed by telephone, modified the Store's lease. The fixed rent was increased to $5,000 per annum, but $24,316 of accrued rent owed by the Store to the Building Corporation was waived, and the percentage rents were substantially reduced, so that only 1½% on sales over $1,100,000 was payable. The board eliminated entirely the percentage rents of 1½% on sales from $600,000 to $800,000; the 3% on sales from $800,000 to $1,000,000; and the 2% on sales over $1,000,000.

In connection with the challenged transaction with the Union Amusement Company on May 10, 1948, it appears that this corporation, hereinafter referred to as Union, was also owned by Englestein, and had occupied the ballroom space, consisting of approximately 20,000 square feet in the building, since 1929. In 1936 the board of directors of the Building Corporation leased the space to the Union Amusement Company for 10 years, from January 1, 1937, to December 31, 1946, at a rental of $250 per month, with additional percentage rents, and all expenses of heating and servicing to be paid by Union. On August 29, 1946, the lease was extended for another 10-year period, and the minimum rental was increased to $300 per month. Union was then paying approximately $.39 per square foot.

There was some evidence that efforts had been made to rent the ballroom, and the board of the Building Corporation, at the suggestion of a special committee, au-

thorized $35,000 to make necessary improvements. Before the work was completed, however, plaintiffs claim that Englestein suggested to the board of the Building Corporation in May, 1948, that the State of Illinois, which occupied the second, and part of the third floors of the building, and was paying $1.50 per square foot, move downstairs to the ballroom, paying its higher rental there, and that Union share in that higher rental. Defendants, however, contend that it was the State of Illinois which suggested the move, so that all of its offices would be on the same floor, and that it threatened to move otherwise.

The board of the Building Corporation on May 10, 1948, approved a five-year lease with the State of Illinois, whereby the State would pay an annual rental of $45,000 for the ballroom space, which was to be converted into offices, and the Building Corporation would be required to furnish heating, decorating, remodeling, janitor and other services. The board also executed a separate rent participation agreement with Union, whereby its lease was subordinated in return for one third of the net increase in rentals from the transaction, with deductions allowed only for the remodeling expenses. Thus, Union's one-third share of the rents was to be computed without deductions for the new servicing and heating obligations undertaken by the Building Corporation under the new lease. Those costs were to be borne solely by the Building Corporation out of its share of the rents.

In support of the validity of the transaction, defendants point out that it was given in consideration of the surrender of Union's lease and that its terms were fair and reasonable, since, according to their computations, the Building Corporation received $105,368.83 as its share of the additional rent from October 31, 1948, to December 31, 1952, and the Union received $52,684.26 for the same period.

Plaintiffs, however, offered testimony of a certified public accountant showing that in effect Union is receiving

close to 50% of the rent increase as a minimum, and 82% as a maximum, since servicing costs for the 20,000 square feet of $1.89 per square foot, according to the cost computation Mackie supplied the Government, are not deducted before computing Union's share and are taken solely out of the Building Corporation's share. Plaintiffs also submitted evidence that under the terms of this agreement Union received some $89,433 up to 1954. Moreover, the most Union ever paid for occupying the space was $9,835, whereas under the participation agreement, Union (and now its assignee Chillo Corporation) received $20,205 as its share of the 1954 rent just for not occupying the space.

In connection with this payment, plaintiffs offered testimony that the Building Corporation's financial report of 1954 listed a payment of $20,205.23 to Chillo Corporation, and when plaintiffs asked the board, consisting of Englestein, Mackie, Bernstein and Peyla, at the stockholders' meeting, who this corporation was, defendant Peyla said he did not know who the officers and directors were, and the other defendants sat mute. Search of the State corporate records, however, revealed that Englestein was president and treasurer of Chillo, Mackie was secretary, and its directors were Englestein, Mackie and Aleck Bernstein.

The five Building Corporation directors who were present and voted to give Union this share of the rentals included Englestein, the director and owner of Union; Mackie, the president of Union; and Bernstein, counsel for Union. Moreover, this rent participation agreement was authorized at a time when Union was several months in default on its rent payments.

Plaintiffs have also challenged defendants' purchase for the Building Corporation of a vacant lot adjoining the building on the south, at a price of $100,000, from the 4753 South Parkway Corporation, referred to hereinafter as the 4753 Corporation. The lot had a frontage of 96 feet and a depth of 289 feet. It was owned and held in

Englestein's name in 1926, until shortly before the reorganization proceedings of the Building Corporation, when Englestein conveyed it to the 4753 Corporation in return for all of that corporation's stock, and some 20 years later this 4753 Corporation sold it to the Building Corporation. The president and treasurer of the 4753 Corporation was Englestein, Mackie was its secretary, and Lippert was its vice-president. These men, together with Peyla and Townsend, acted for the board of the Building Corporation in approving this purchase. Their resolution of February 17, 1949, stated that no action should be taken in connection with this purchase until written approval of directors Teter and Bernstein was received. Although Mackie testified that no written approval was received, after the proofs were closed defendants offered undated letters of approval from Teter and Bernstein sent to defendants' counsel, Vollers.

The testimony of qualified real-estate appraisers on the value of this property was sharply conflicting. Plaintiffs' appraiser valued it at $45,800, as the site of a one-story commercial building; and defendants' appraiser valued it at $103,000 and at $150,000, based on its operation as a parking lot for hire. The evidence shows, however, that the lot was not operated that way, but rather as a free parking lot for the benefit of the officers and employees of the building, its tenants, and their customers. According to plaintiffs' evidence, the cost for the raw land was $4,500 per customer car; whereas defendants contended it was $1,613 per car. Plaintiffs also offered evidence that Wieboldt's was able to buy land and also build a parking garage for a similar purpose, for a combined cost of $1,200 per car in Oak Park, and for $2,000 per car in Evanston. Plaintiffs also submitted that a parking lot in the same general area as the lot involved herein had been purchased in 1944 for $6,300, with a cost of approximately $63 per car.

The final transaction challenged by plaintiffs related to

the agreements in connection with the Meadows Mercantile lease, executed by the Building Corporation in June, 1952. It appears that Englestein's Store closed its doors on May 15, 1952, and offered its business for sale, at about the time this litigation began. The Store negotiated a sale of its inventories to Meadows Mercantile, but that contract made it mandatory that Meadows secure its lease from the Building Corporation. The board of the Building Corporation, at Englestein's request, executed a lease for the premises to Meadows Mercantile, providing for an annual minimum rental of $65,000, and a percentage rental of $3\frac{1}{4}\%$ of the gross sales. This rental was some $2\frac{1}{2}$ times that paid by Englestein's Store. In addition, the board of the Building Corporation approved a separate agreement with the Store, under which the Building Corporation was to pay the Store one third of the net increase in rent collected from Meadows Mercantile. Under this agreement, the Store's share would not be affected by the operating expenses and improvements which the Building Corporation was obliged to furnish the new tenant under the lease and had to pay out of its share of the rents.

According to defendants' calculations, during the period from 1952 to 1954, the Building Corporation realized an increase of rent income of some $61,113.17 as lessor of the premises, while during this same period the Store realized $61,402.44, or some $289.27 more, for not occupying the space. Defendants, however, omit to note that from this share the Building Corporation had to bear all the operating costs, so that the share actually realized by the Building Corporation was substantially less. In fact, the record shows that from the gross rents of $195,897 collected by the Building Corporation from Meadows Mercantile up to October 31, 1954, the Building Corporation had to pay out costs of $106,582 for air conditioning, $75,000 for new wiring (for the entire building), and $61,402.44 to Englestein's Store. The board which author-

ized this rent participation agreement had been reduced to five members, and included Englestein, Mackie and Bernstein.

Finally, plaintiffs call attention to the fact that for all his services to the Building Corporation, Englestein was paid a management fee of 5% of the gross rentals.

On the basis of substantially the foregoing evidence, the master found that defendants should be required to account to the Building Corporation for the benefit of its shareholders for the losses resulting from all of the challenged transactions, except the purchase of the vacant lot. The chancellor, however, held that the defendants had breached their fiduciary duties in all of the transactions, for which they must account to the Building Corporation according to designated standards. He also ordered that defendants' shares of stock in the Building Corporation shall be charged with the liability for such payments. That decree was reversed by the Appellate Court on the ground that under Illinois law the plaintiffs had failed to sustain the burden of establishing that the transactions were fraudulent.

On this appeal plaintiffs claim that the Appellate Court erred in construing Illinois law as placing upon the plaintiff shareholders the burden of establishing actual fraud in transactions between corporations with interlocking directorates, and in reversing the findings of the master and chancellor, without weighing the evidence or finding that the conclusions were against the manifest weight of the evidence.

Defendants contend that the Appellate Court properly reversed the chancellor on the grounds that his findings and order were based upon an erroneous concept of law, whereby transaction between corporations with some common directors were conclusively fraudulent, and that the evidence showed that all of the transactions were approved by a disinterested majority of the board, and were eminently fair to the Building Corporation.

In adjudicating this appeal, it is obvious that we must first review and clarify Illinois law respecting the obligation of corporate directors in transactions between corporations with common directors. In so doing, we must strive, as have other courts which have grappled with the problem, to protect shareholders from exploitation by directors, and at the same time to avoid undue restrictions of corporate activity. 61 Harv. L. Rev. 335.

This court, in conformity with the practically universal judicial opinion, has recognized that directors, or other officers of a corporation, occupy a fiduciary relation toward it. *Dixmoor Golf Club, Inc.* v. *Evans,* 325 Ill. 612; *Winger* v. *Chicago Bank & Trust Co.* 394 Ill. 94; 33 A.L.R. 2d 1060, *et seq.;* 3 Fletcher, Corporations, 357; *Irving Trust Co.* v. *Deutsch,* (2d Cir.) 73 F.2d 121; *Geddes* v. *Anaconda Copper Mining Co.* 254 U.S. 590, 65 L. ed. 425; *Young* v. *Higbee Co.* 324 U.S. 204, 89 L. ed. 890; *Meinhard* v. *Salmon,* 249 N.Y. 458, 164 N.E. 545; *Perlman* v. *Feldman,* (2d cir.) 219 F.2d 173, 176; *Commonwealth Title Ins. & Trust Co.* v. *Seltzer,* 227 Pa. 410, 76 Atl. 77; 53 Mich. L. Rev. 472; 61 Harv. L. Rev. 335.

In the *Dixmoor case* this court stated at p. 616: "The directors of a corporation are trustees of its business and property for the collective body of stockholders in respect to such business. They are subject to the general rule in regard to trusts and trustees, that they cannot, in their dealings with the business or property of the trust, use their relation to it for their own personal gain. It is their duty to administer the corporate affairs for the common benefit of all the stockholders and exercise their best care, skill and judgment in the management of the corporate business *solely in the interest of the corporation.* * * * It is a breach of duty for the directors to place themselves in a position where their personal interests would prevent them from acting for the best interests of those they represent." (Italics ours.)

The court expounded that while a director is not disqualified from dealing with the corporation and buying its property, or selling property to it, the transaction will be subject to the closest scrutiny, and if not conducted with the utmost fairness, "to the end that the corporation shall have received full value," it will be set aside. The court then held that since the board of directors therein was dominated by one member, and had purchased land from him for the corporation at a price that was 2½ times more than required by his option, the transaction would be set aside, even though the corporation had use for the land, and had received some benefit from the transaction.

The same year, this court in *White v. Stevens,* 326 Ill. 528, without referring to the *Dixmoor case,* reiterated that a director may deal with the corporation of which he is a member, provided he acts fairly and for the interest of the company. The court also recognized that corporations having directors in common may contract with each other "if the contracts are fair and reasonable," but emphasized that such transactions would be carefully scrutinized by equity. In the case before it, where the allegedly offending corporation had "procured the furniture for the hotel company at prices charged by manufacturers and wholesalers and furnished it to the hotel company at the same price," the court found that "the most careful scrutiny fails to disclose any unfairness to or overreaching of the hotel company in the entire transaction."

In the course of this opinion, however, the court, without any citation of authority, made the statement, relied upon by defendants, that in contracts between corporations having one or more common directors "there is no presumption in such case that the contract is unfair or oppressive but the person attacking it must prove its unfairness." This dictum has not been followed in a single decision of this court, and was quoted only in one other Appellate Court case, *Nagel v. Northern Illinois Gas Co.* 12 Ill. App.

2d 413, in which that court cited no other Illinois authority in support of that proposition. Moreover, contrary to defendants' assertion, this dictum in the *White case* has not been recognized as the "Illinois rule," nor has it been cited on this point in other jurisdictions.

A contrary approach was taken by this court in *Winger* v. *Chicago Bank & Trust Co.* 394 Ill. 94, which was cited, but apparently misconstrued by the Appellate Court herein. After reviewing the English and American authorities on the fiduciary status of corporate directors, the court in the *Winger case* reaffirmed the rule in the *Dixmoor case,* and noted further that the fact that directors do not deal directly with themselves, but deal with another corporation which they own or control, will not change the effect of the transaction. In fact, the court pointed out that it is practically the unanimous opinion of courts that, even if only one of the directors voting for the transaction profited thereby, and his vote was necessary, the transaction would be tainted with the same illegality and fraud as though they were all interested. Under those circumstances, the directors have the burden of overcoming the presumption against the validity of the transaction, by showing its fairness and propriety.

Although we are cognizant of language in the *Winger case* suggesting that transactions approved by corporation boards on which there is no disinterested majority may be set aside irrespective of their fairness, and we note that some Illinois cases have followed that stringent rule (*Klein* v. *Independent Brewing Ass'n,* 231 Ill. 594; *Schroeder* v. *Otto,* 240 Ill. App. 567, 586; *Pelcak* v. *Bartos,* 328 Ill. App. 435), nevertheless, we find that the *Winger case,* construed in its entirety, holds that transactions between corporations with common directors may be avoided only *if unfair,* and that the directors who would sustain the challenged transaction have the burden of overcoming the

presumption against the validity of the transaction by showing its fairness.

While the acts of the directors in the *Winger case* may have been a more flagrant breach of fiduciary duty, as defendants contend, than those involved in the instant case— depending upon one's view point—those circumstances do not change the rule of law applied by the court. Moreover, we agree with the court that no distinction should be made, as defendants suggest, between transactions of a director with his corporation and those in which he hides behind the corporate veil and deals through another corporation which he owns or controls.

The *Winger case* has never been overruled by this court. Although we have not decided a case involving the breach of a fiduciary duty by corporate directors in the intervening years, we have cited the case in support of the general rule respecting transactions of a fiduciary. (*Bakalis v. Bressler*, 1 Ill.2d 72, 82; *Finn v. Monk*, 403 Ill. 167, 181.) Moreover, the Federal court in *Dwyer v. Tracy*, 10 F.R.D. 115, cited the *Winger case* as declarative of Illinois law respecting fiduciary obligations of corporate directors. The case has also been cited with approval by several of our Appellate Courts. *Robb v. Eastgate Hotel, Inc.* 347 Ill. App. 261, 275; *Greenfield v. 5222 Harper Avenue Building Corp.* 351 Ill. App. 375.

Furthermore, it appears that the *Winger case* is consistent with the rule followed by the overwhelming majority of courts. 33 A.L.R. 2d 1060, 1069; *Geddes v. Anaconda Copper Mining Co.* 254 U.S. 590 (1921); *Pepper v. Litton*, 308 U.S. 295, 306, 84 L. ed. 281; *Mayflower Stockholders Protective Committee v. Mayflower Hotel Corp.* (D.C. Cir.) 193 F.2d 666; *Epstein v. United States*, (6th Cir.) 174 F.2d 754; *Marian v. Mariani*, 276 App. Div. 205, 93 N.Y.S. 2d 370; *Roberts v. Saukville Canning Co.* 250 Wis. 112, 26 N.W.2d 145; *Remillard Brick Co. v. Remillard-Dandini*

*Co.* 109 Cal. App. 2d 405, 241 P.2d 66; 61 Harv. L. Rev. 335, 336; 35 Det. L. J. 561, 576; 3 Fletcher, Corporations, 454, 973-4 (1947 ed.).

In the leading case of *Geddes* v. *Anaconda Copper Mining Co.* 254 U.S. 590, followed by an imposing body of authority, the operative facts were somewhat analogous to those in the case at bar in that they involved transactions between corporations with common directors and allegedly inadequate consideration. The challenged transaction there, however, involved a sale of all the corporate property, whereas the transactions in the instant case involve agreements allegedly siphoning a substantial portion of the corporate assets. The United States Supreme Court, after noting that the record showed beyond controversy that Ryan was an officer and director and dominated the affairs of the buying and selling companies, as well as their boards of directors, set aside the transaction. In so doing, the court promulgated the oft quoted rule at p. 599: "The relation of directors to corporations is of such a fiduciary nature that transactions between boards having common members are regarded as jealously by the law as are personal dealings between a director and his corporation; and where the fairness of such transactions is challenged, the burden is upon those who would maintain them to show their entire fairness; and where a sale is involved, the full adequacy of the consideration. Especially is this true where a common director is dominating in influence or in character. This court has been consistently emphatic in the application of this rule, which, it has declared, is founded in soundest morality, and we now add, in the soundest business policy."

In our judgment, the *Geddes* rule, which is essentially the same as that applied in the *Winger case,* is not only legally cogent, but is consistent with the entire concept of the fiduciary relation in the fabric of our commercial law. The contrary rule, urged by defendants, whereby those

attacking the transactions of fiduciaries would have the burden of establishing its unfairness or fraudulency is not only without substantial support in the case law, but would put a premium on sharp practices by directors by putting the onus of proof on their victims, and would also tend to further separate corporate management from ownership.

In contrast, the rule of the *Geddes* and *Winger* cases, insofar as it provides that the directors shall have the burden of establishing the fairness and propriety of the transactions, not only protects shareholders from exploitation, but permits flexibility in corporate dealings. While the concept of "fairness" is incapable of precise definition, courts have stressed such factors as whether the corporation received in the transaction full value in all the commodities purchased; the corporation's need for the property; its ability to finance the purchase; whether the transaction was at the market price, or below, or constituted a better bargain than the corporation could have otherwise obtained in dealings with others; whether there was a detriment to the corporation as a result of the transaction; whether there was a possibility of corporate gain siphoned off by the directors directly or through corporations they controlled; and whether there was full disclosure—although neither disclosure nor shareholder assent can convert a dishonest transaction into a fair one. *Epstein* v. *United States,* 174 F.2d 754, 768; 61 Harv. L. Rev. 335, 338; *Perlman* v. *Feldman,* 219 F.2d 173.

Moreover, where the corporate directors fail to establish the fairness of the challenged transaction, it may either be set aside, or affirmed and damages recovered for the losses sustained by the corporation. *Wallace* v. *Malooly,* 4 Ill.2d 86, 98; *Dixmoor Golf Club, Inc.* v. *Evans,* 325 Ill. 612; *Marian* v. *Mariani,* 93 N.Y.S. 2d 370; 3 Fletcher, Corporations, 357.

In the light of this analysis of the appropriate rules and

guiding considerations, we shall determine the propriety of the five challenged transactions of the board of the Building Corporation herein.

Inasmuch as the authorization of the payment of $100,000 to the Store for its fixtures was conditioned on the subsequent modification of its lease, we shall consider these transactions together. It is undisputed that at the time of these transactions the board of the Building Corporation consisted of seven members, and that director Sturm resigned in protest of the payment of $100,000 to the Store. The remaining six directors present and voting for that purchase included Englestein, the owner and president of the Store; Mackie, a Store director; and Bernstein, who was the lawyer for Englestein and for the Store, as well as for Englestein's other business enterprises. We cannot, under the circumstances, perceive just how defendants can seriously characterize Bernstein as an independent and disinterested director representing only the Building Corporation.

It is therefore apparent that the fixture purchase authorized on March 18, 1948, could not conceivably be deemed to have been approved by an independent and disinterested majority of directors of the Building Corporation. Furthermore, as pointed out in the *Geddes case*, it is not the mere number of common directors which determines whether approval has been given by an independent and disinterested majority of directors, but rather whether a majority of the directors are dominated by an individual or a group.

Nor was the modification of the Store lease on May 4, 1948, effected by an independent and disinterested majority. At that time only five members of the board were present, Townsend being out of town and apparently informed by telephone, and the votes of approval included Englestein, Mackie and Bernstein, along with Teter, and Peyla, who thought that the Store rent was being increased. There-

fore, in view of the lack of approval by a disinterested majority, it was incumbent upon defendants to sustain the burden of establishing the fairness of these transactions.

It is uncontroverted that the Building Corporation had no commercial use for the fixtures, which even included the asphalt tile and built-in partitions, all of which were continued to be used by the Store. Moreover, since the used fixtures had limited intrinsic value, as compared with their cost of $100,000, the only consideration which the corporation could realize from this substantial outlay would be through its rental charges. While the directors on May 4, 1948, increased the minimum rent payable by the Store by some $5,000, they eliminated practially all of the percentage rents, except the 1½ per cent on sales over $1,100,000, which was tantamount to a 40% reduction in future rents, and also waived some $24,316 of accrued rent owed by the Store.

In defense of this transaction, defendants and the Appellate Court stress that the economic health of the Store was of great value to the Building Corporation, since it meant the retention of a tenant and benefited all the other tenants, which were economically interdependent, and therefore justified pouring money into the Store. In our judgment, however, the economic interdependence of the tenancies (Neisner's, Walgreen's, and the Store) hardly justifies giving one of them—the Store owned by Englestein—all of the financial benefits, and requiring the other tenants to pay rents which were 10 to 20 times higher per square foot than the rent paid by Englestein's Store. In this connection, the evidence showed that the rent paid by the Store, even in 1948, was $20,737, or $.24 per square foot, as compared with rentals of $42,875 or $2.00 per square foot paid by Neisner's for similar space, and $30,708 or $5.44 per square foot paid by Walgreen's. It is also difficult for us to comprehend just why the Store was such a valuable tenant when other tenants paid much higher rentals,

and when the record shows that the subsequent tenant of the premises willingly paid a rental over 2½ times as much as that paid by the Store.

It is therefore patent from the evidence that defendants not merely failed to establish the fairness of this $100,000 used fixture purchase and rent reduction scheme, but that it was tantamount to a deliberate depletion of corporate assets, for the benefit of another corporation in which 3 of the 6 directors had adverse interests. Under those circumstances, the findings and orders of the master and chancellor that defendants' conduct constituted a breach of their fiduciary duty, for which they must account to the Building Corporation, were neither contrary to the manifest weight of the evidence, nor predicated on a conclusive presumption, as defendants argue. It was therefore error for the Appellate Court to have set aside those findings.

With reference to the rent participation transaction executed by defendants with Union on May 10, 1948, it is undisputed that Union was owned by Englestein, that Mackie was its president and director, and that Bernstein was its legal counsel. Moreover, Englestein, Mackie and Bernstein were among the 5 directors of the Building Corporation who approved this transaction. Townsend was apparently absent, and, according to defendants' tabulation, gave his approval later. Thus, once again, the action was taken by a board that was dominated, both numerically and in fact, by Englestein and his "business colleagues."

As hereinbefore noted this agreement gave Union one third of the net increase in rent to be paid by the State of Illinois, in return for Union's giving up its lease for the ballroom space, at a time when Union was several months in arrears in its rental payments and its lease probably could have been set aside. Furthermore, since Union's share was to be computed without deductions for the newly assumed costs of heating and servicing in the State's lease, which

had to be paid out of the Building Corporation's share of the rentals, Union, in effect, received under this agreement close to 50% of the increased rentals just for not occupying the space. Pursuant to that agreement Union has withdrawn from Building Corporation funds some $89,433 up to 1954; and in 1954 alone Union received as its share of the rents some $20,205 (paid to Chillo, Union's assignee) which is more than twice as much rent as Union ever paid to the Building Corporation in any year.

The mere recital of the terms of this agreement, which very probably need not have been executed, reveals the unfairness to the Building Corporation. We are not misled by defendants' calculations of the great benefits to the Building Corporation from the increased rentals now paid by the State of Illinois, for we recognize that from those sums must be deducted the expenses of heating and servicing the 20,000 square feet, as well as Union's share of the rents. Moreover, it is no defense to the agreement that the Building Corporation enjoys some benefits from the transaction; the crux of the matter is that rentals which should properly belong to the Building Corporation are being siphoned off, expense free, to another Englestein corporation, and the stockholders of the Building Corporation are receiving less from their ownership of the space than Union got for not occupying the space. Under these circumstances we cannot agree with the Appellate Court that the transaction "appears to be a fair and reasonable one." On the contrary, the master's and chancellor's findings that it constituted a breach of fiduciary duty appear to be amply supported by the evidence and should not have been set aside.

In connection with defendants' purchase of the adjoining vacant lot for $100,000 from the 4753 Corporation, authorized February 17, 1949, the evidence is undisputed that the selling corporation was owned by Englestein. Moreover, the purchase did not have the approval of an

independent and disinterested majority of the board of the Building Corporation, since the five directors present and voting on it included Englestein, Mackie and Lippert, who were the president, secretary and vice-president, respectively, of the 4753 Corporation. Nor was this balance significantly changed by including the after discovered letters of approval sent by directors Bernstein and Teter to defendants' counsel herein.

As hereinbefore noted, the appraisals of the property were sharply conflicting, with plaintiffs' witness valuing it at $45,800, under its best use as the site of a one-story commercial building; and defendants' witness valuing it at $103,000 and $150,000 under its best use as a parking lot for hire. Even though the Building Corporation received value from this transaction, the excessive price paid for this property, and the fact that the money went to a corporation in which a majority of the directors had adverse interests, preclude our regarding this transaction as a mere matter of business judgment. Defendants "should not be permitted to cloak themselves in the immunity of the business judgment rule.'" (*Sanarelli* v. *Katz*, (7th Cir.) 270 F.2d 762, 768.) The chancellor therefore properly found this transaction to be a breach of fiduciary duty and ordered defendants to account for the difference between the price paid by the Building Corporation and the fair cash market value predicated on its highest and best use at the date of the board action.

In evaluating the challenged lease arrangements authorized by defendants on June 18, 1952, and involving the Building Corporation, Meadows Mercantile, and the Store, since Englestein, Mackie and Bernstein, whose connections with the Store have already been noted, constituted three of the five-member board which approved the transaction, it should be carefully scrutinized, as our court has repeatedly stated.

As hereinbefore noted, the Store, on May 15, 1952,

closed its doors and offered its business for sale, even though its lease did not expire until May 31, 1962. Shortly after this suit was filed on May 23, 1952, the Store negotiated a sale of its inventories and made various financial agreements with Meadows Mercantile, which agreed to pay the Building Corporation a rental some 2½ times that paid by the Store. At Engelstein's request, the Building Corporation executed such a lease to Meadows, and at the same time approved the separate rent participation agreement with the Store, in return for the cancellation of its lease. Under that agreement, the Store was given one third of the net increase in rents collected from Meadows. This share was computed without any deduction for operating expenses or improvements of the premises, all of which the Building Corporation was obliged to pay under the lease with the new tenant.

While we are cognizant that the Store's pending lease did have some value, it could hardly justify an agreement under which the Store received more for not occupying the property than the lessor who owned the property. According to defendants' own figures, the Building Corporation paid the Store some $61,402.44 as its share of the Meadows' rent between 1952 and 1954, while the Building Corporation received only $61,113.17 of the rent increase, or some $289 less, and had to pay out more in capital improvements under the Meadows lease than it received as its share of the increased rents. The unfairness of this bountiful agreement is even more patent when it is realized that it was entered after the Store had closed its doors and had offered its business for sale, and would have had to make adjustments on its lease in any event. This was not a case of a corporation forced to give up its lease against its will.

Viewing the transactions in their entirety, it is apparent that none of them were authorized by an independent disinterested board "with loyalties only to the Building Cor-

poration," as defendants assert. In fact, defendants' own chart indicates that Englestein, Mackie and Lippert had adverse interests, and surely Bernstein, who was Englestein's attorney, and attorney for the Store, for the Union, and for the 4753 Corporation, can hardly be deemed a disinterested director. Thus, at best, three of the six men authorizing the transactions had adverse interests. Of the three "independents," Townsend was out of town on several occasions, and gave approval either by telephone or by subsequent approval of the minutes, and Peyla, who lived and conducted his business in Joliet, thought the modification of the Store's lease in May, 1948, meant an increase rather than a reduction in rent, which it was in fact. Nor did he know—or admit—the identity of Chillo, a corporation to whom the Building Corporation paid over $20,000 in 1954.

We cannot close our eyes to the domination of the board of the Building Corporation by Englestein and his "business associates." Labeling them "bondholder committee directors," because they had been appointed some thirteen years before to represent the bondholders, does not imply fidelity or impartiality, or change the character of their acts.

Under these circumstances the defendant directors had the burden under Illinois law to establish the fairness and reasonableness of the various transactions, and that the corporation was paid full consideration and suffered no detriment, nor was deprived of any proper benefits. (*Dixmoor Golf Club, Inc.* v. *Evans,* 325 Ill. 612; *Winger* v. *Chicago Bank & Trust Co.* 394 Ill. 94; 33 A.L.R. 2d 1072; *Geddes* v. *Anaconda Copper Mining Co.* 254 U.S. 590; 61 Harv. L. Rev. 335.) In resolving whether they sustained that burden, it would serve no useful purpose to either analogize or distinguish the circumstances herein from those in each of the cases cited by the parties, in view of the infinite factual variations affecting the fairness of the disputed transactions in each of those cases.

From our evaluation of each of the transactions in the instant case, it is evident that the gross income of the Building Corporation was increased when "legitimate rentals" were paid, and Englestein's companies, which enjoyed rents that were tantamount to "subsidies," were no longer tenants. However, as we have emphasized throughout this opinion, these gross increases cannot obscure the "siphoning off" and waiver agreements whereby the Englestein corporations drained from the Building Corporation approximately $464,886 up to the close of proof in 1954 for property and assets worth a fraction of that sum. Nor do we find that the retention of Englestein's Store as a tenant justified the Building Corporation in practically underwriting the Store's economic well being by giving it substantial monetary preferences given to no other tenant of the building.

Although defendants point out that the Building Corporation has still prospered, and that dividends of $3.50 per share were paid to stockholders each year from 1945 to 1953, in view of all the increased income, which defendants boast their transactions brought to the Building Corporation, the amount available for dividends should have increased. It would have, if defendants had not depleted the Building Corporation's assets for the benefit of the Store, Union, and the 4753 Corporation. In fact, according to the record, there was actually a 41% decline in income for shareholders of the Building Corporation in the period from 1948 to 1952.

On the basis of our analysis of the evidence, therefore, defendants completely failed to establish the fairness of these five challenged transactions, and their conduct constituted a breach of fiduciary duty for which the chancellor properly ordered them to account. Moreover, the standards for rendering such an account, imposed by the master and chancellor, gave proper credit for any values received by the Building Corporation, which, contrary to .

defendants' contention, were not limited to merely avoiding the transactions. The Appellate Court erred, therefore, in setting aside the chancellor's findings and orders, and in its interpretation of the law respecting the fiduciary obligation of corporate directors in transactions between corporations with common directors.

Although the Appellate Court, under the view it took of the case, did not find it necessary to pass upon the defenses of ratification and *laches,* both parties have presented arguments on these matters on this appeal. Defendants, however, have suggested, at the same time, that the questions need not be considered. The master and chancellor found that the defense of *laches* was not available to defendants, and in view of the continuing nature of their offenses and plaintiffs' lack of knowledge of the complete facts earlier, that conclusion should properly be affirmed. The defense of ratification was also denied by the master and chancellor, who properly stressed that there could be no ratification in the absence of adequate disclosure, which defendants herein had failed to make to the stockholders.

Therefore, in our opinion, the judgment of the Appellate Court setting aside the decree of the chancellor, and ordering that the complaint be dismissed for want of equity must be reversed, and the cause remanded to the circuit trial court so that the decree entered by the chancellor may be properly effectuated.

*Reversed and remanded, with directions.*