UNITED FOUNDERS LIFE INSUR-
ANCE COMPANY, Plaintiff-
Appellee,

v.

CONSUMERS NATIONAL LIFE INSUR-
ANCE COMPANY et al., Defendants-
Appellees.

Marlene B. PACE et al., Plaintiffs-
Appellees,

v.

Thomas H. REDMOND et al.,
Defendants-Appellees.

UNITED FOUNDERS LIFE INSUR-
ANCE COMPANY et al., Plaintiffs-
Appellees,

v.

Gerald M. DUNNE et al., Defendants-
Appellees.

Appeals of Ira VAN TUYL et al.

Nos. 18886–18889, 18977–18980.

United States Court of Appeals,
Seventh Circuit.

Aug. 17, 1971.

William C. Welborn, Jr., D. Bailey Merrill, Evansville, Ind., for appellants.

Elwin Hewins, Hornsby Mims, Evansville, Ind., Vincent Kelley, Anderson, Ind., William P. Foreman, Evansville, Ind., Thomas D. Logan, Fort Wayne, Ind., John L. Carroll, Evansville, Ind., Hyman Edelman, Minneapolis, Minn., Doran E. Perdue, Robert E. Kelly, Theodore Lockyear, Evansville, Ind., for appellees.

Before KILEY, STEVENS and SPRECHER, Circuit Judges.

SPRECHER, Circuit Judge.

These consolidated appeals seek to set aside two district court judgments approving the settlements of three primary actions under Rules 23 and 23.1 of the Federal Rules of Civil Procedure.

Consumers National Life Insurance Company ("Consumers") was organized in 1958 as a life insurance company under Indiana laws by persons residing in and around Evansville, Indiana. By the end of 1969, its admitted assets were $14,881,256; its insurance in force was $195,746,564; its annual premium income was $3,622,811; its investment income was $712,505; and its capital and surplus was $2,697,188. It had in excess of ·5,000 shareholders residing in 49 states and three foreign countries. It was duly qualified and licensed to conduct an insurance business in 32 states, including Indiana.

United Founders Life Insurance Company ("United") is an Oklahoma corporation engaged in the life insurance business, maintains its principal office in Oklahoma City, and is licensed to do business in Indiana.

Beginning on October 21, 1968, a series of agreements between United on one hand and Thomas H. Redmond and Bankers Acceptance Corporation ("Bankers"), of which Redmond was president, on the other, provided that Redmond and Bankers would sell United a minimum of 230,000 shares of Consumers' common stock for $17 per share, payable in cash and other securities. At that time Redmond and Bankers held less than 100,000 shares but more than 10 percent of Consumers' outstanding stock, which consisted of 537,914 shares of common stock of $1 par value. Redmond-Bankers contemplated that they would sell to United considerably more stock than they owned; the undertaking obviously required that they purchase or procure the deficiency.

When the officers and directors of Consumers learned of United's agreements with Redmond and Bankers and that United planned to dominate Consumers' board of directors and to secure the merger of United and Consumers and when, upon investigation, they concluded that United's control of Consumers was not in the best interests of Consumers, its policyholders and its shareholders, they determined that they would thwart the United takeover.

In 1963, the directors and shareholders of Consumers had duly amended its articles of incorporation to increase its authorized capital stock to 1,500,000 shares of $1 par value common stock. Having almost one million shares of authorized but unissued stock available for

issuance, the officers and directors of Consumers negotiated an agreement whereby Consumers on March 25, 1969, sold 280,000 of its shares to John G. Arbour, Gerald M. Dunne, John E. McCullough and Frank H. Seyer ("Dunne Group") for $13 per share, which was paid for by a promissory note. Of the $3,640,000 purchase price, $280,000 was paid within 20 days; the balance was payable within one year with interest at 6 percent per annum, with the stock pledged to secure payment.

The annual meeting of shareholders following the United-Redmond-Bankers agreements and the Consumers-Dunne Group agreement was scheduled for April 28, 1969. Before that time three lawsuits were filed.

On April 1, 1969, United brought suit in the United States District Court for the Southern District of Indiana against Consumers, its officers and the Dunne Group to have the Dunne transaction declared void and to enjoin the voting of the Dunne shares at the April 28 meeting (identified as case "No. 23").

On April 4, 1969, Consumers, two of its officers and directors and Marlene B. Pace, on her own behalf and on behalf of all other shareholders of Consumers, brought suit in the same district court against United, Redmond, Bankers, the Dunne Group and others (identified as "No. 25"). Plaintiffs sought injunctive relief against voting the shares acquired by United and damages for short-swing profits arising out of the short-sale agreement between United and Redmond-Bankers, as well as damages and rescission for the shareholder class because of the alleged premium received by Redmond-Bankers for their sale of control shares.

On April 18, 1969, United, individually and as a Consumers shareholder, commenced a derivative action in the United States District Court for the District of Connecticut against Consumers and its directors, praying for rescission of the sale of the 280,000 shares to the Dunne Group, for injunction against the voting thereof and for damages. This action was transferred to the Southern District of Indiana and is identified as "No. 46."

The respective plaintiffs in Nos. 23 and 25 sought preliminary injunctions. The district court held evidentiary hearings in both cases on April 18 and 19, 1969, during the course of which it heard testimony and admitted into evidence a great number of affidavits. On April 25, the district court denied preliminary injunctions in both cases. The court found that "it was not in the best interest of Consumers, its policyholders, and its shareholders that the plaintiff [United] obtain control of Consumers or effect such merger."

At this point it is pertinent to identify some of the principal individuals involved. The three shareholders of Consumers who objected to the settlements in issue and became the appellants here are Ira Van Tuyl, Paul Jeffries and Adelia J. Evans. Van Tuyl, an Evansville resident in the oil business, was involved in the organization of Consumers and has been on its board of directors from 1958 to the present, except when enjoined for a period of time. In 1964, he became chairman of the board and was holding that position at the time of the United-Redmond-Bankers agreements and the Consumers-Dunne Group agreement. He was also acting as the chief financial officer or investment officer of Consumers. Van Tuyl's attorney in the district court was Gerald H. Evans, the husband of Adelia J. Evans. Paul Jeffries is Adelia's brother. Paul and Adelia are the children of one of the founders of Consumers.

In 1964, at the time Van Tuyl became chairman, Hornsby Mims, a professional insurance man and Evansville resident, became president of Consumers. Marlene B. Pace, the shareholder purporting to represent the class of shareholders in case No. 25, is employed by Consumers as private secretary to Mims.

Richard C. Davoust, an Evansville resident in the oil and gas investment business, became a Consumers director in December, 1964, at Van Tuyl's invitation and remained a director until Feb-

ruary, 1970, when he resigned. He was re-elected to the board on August 31, 1970, and is presently chairman of the board of Consumers.

This recitation is sufficient to indicate that the principal antagonists have been the top officers and directors of Consumers, rather than the shareholders as such. The transactions at issue must be closely scrutinized with this in mind.

The Consumers annual shareholders' meeting was held on April 28, 1969. The Dunne Group had given a proxy supporting the election of the Consumers management slate as directors (the "Van Tuyl Group"). During the course of the meeting, the Dunne Group filed a later-dated proxy in support of a different slate consisting of nominees of the Dunne Group and of United with a few management representatives. The voting was closed on April 28 with the Dunne-United slate apparently elected. Before the tellers' report of election was officially presented on April 29, the Dunne Group again changed its proxy to support the management slate; the election tellers approved the late change and declared the management slate elected. In order to induce the Dunne Group to make the latter switch, the Van Tuyl Group delivered several undated resignations, including Van Tuyl's, to Dunne. Thereafter, United claimed that its slate had been elected; management insisted that its slate comprised the duly elected directors.

On October 8, 1969, United and the Dunne Group agreed that United would purchase the 280,000 Consumers shares owned by the Dunne Group for $4,040,-000, which represented a $400,000 profit above the price paid plus a finder's fee of $100,000 to one of Dunne's attorneys. On October 16 Dunne presided at a Consumers board of directors' meeting at the John F. Kennedy Airport in New York City, in which Van Tuyl's and one other director's undated resignations were accepted, the board was increased in number from 11 to 13, Dunne Group nominees were elected to fill the vacan-

cies, the Dunne note to Consumers was extended and an exchange of Consumers shares for United shares was approved. Thereupon the Dunne Group nominees except Dunne resigned from the board and United nominees were elected.

On November 7, 1969, Dunne filed a suit in an Indiana state court to enjoin Van Tuyl and others from purporting to act as Consumers directors. Thereafter the plaintiffs in case No. 25 in the district court filed a supplemental complaint to invalidate the October 16 meeting and actions. The defendants filed a supplemental answer to invalidate the April 28–29 meeting and actions. In December, dual meetings were held by the two purported Consumers boards. Davoust was elected chairman of the management board; he advised the board that he would undertake settlement of the litigation as his primary duty.

Meanwhile, the market value of Consumers shares dropped so that by the time of the settlement hearing in mid-1970 the quoted market price for Consumers' stock was less than $4 per share. Barton, the president of United, indicated to Mims, the president of Consumers, that United would be willing to dispose of its Consumers shares if it could obtain certain of Consumers' assets for them. Davoust and Mims attempted to interest outside investors in taking over United's stock position in Consumers but without success; one prospective investor said, "I never saw such a legal can of worms; I don't want to go fishing with it."

Dunne was also having problems. United's loss of interest in Consumers apparently also chilled its desire to consummate the agreement with the Dunne Group to buy its Consumers shares. In any event the litigation had at least temporarily halted that transaction. The Dunne Group remained liable on the note for $3,360,000 to Consumers. The Group's intention of obtaining all or part of the assets of another insurance company and paying the note with those assets did not materialize. At this point

both United and the Dunne Group showed huge paper losses on their respective investments in Consumers' stock; both appeared anxious to dispose of the stock if the losses could be minimized. The problems of settlement included the need to minimize each party's loss without requiring Consumers to absorb the entire loss. This need obviously motivated the Consumers officers and directors in trying without success to find outside investors to take over both United's and the Dunne Group's stock position in Consumers.

The record amply supports the conclusion that Consumers' management devoted itself wholeheartedly to seeking some solution to its problems of interminable litigation, dual or treble claims for control, and the depressant and dispiriting effect of uncertain management upon the morale of the entire organization.

Although under normal conditions Consumers may have been an attractive investment, particularly if investment promised control, nevertheless the "can of worms" of litigation and the wide disparity between the quoted market price and the investment per share needed to assume United's and Dunne Group's respective positions proved an almost insurmountable obstacle to a solution.

The Dunne Group felt that it had been victimized and "had been the pigeons" in the game of playing off one potential control group against another. The search for new pigeons proved fruitless.

Against this background, Davoust resigned from the Consumers board on February 20, 1970, and a few days later presented his plan for settlement of the United litigation which was later consummated as follows:

(1) Five assets with a book value of $1,473,072.32 were transferred by Consumers to D.P.C., Inc., an Oklahoma corporation in which Davoust is sole shareholder, for $1,160,000 cash.

(2) Consumers granted D.P.C. an option for $20,000 to purchase 200,000 shares of its common stock for $6 per share during the first year and $7 per share the second year. The option or the shares issued under the agreement are not assignable without Consumers' consent. If Consumers does not consent, it or its nominee has the prior right to purchase on the same terms.

(3) D.P.C. sold the five assets to United for the 116,190 shares of Consumers owned by United. D.P.C. also acquired an additional 8,000 qualifying shares from United's associates for $40,-000, making a total of 124,190 shares of Consumers' stock acquired by D.P.C.

(4) Consumers agreed not to issue any of its authorized but unissued common stock unless such stock is first offered to D.P.C.

(5) United released all its claims against Consumers and its associates. The settlement did not affect the claims of Consumers and its shareholders against Redmond and Bankers.

Subsequent to the Davoust settlement of the United litigation, Consumers' management negotiated a settlement of the Dunne Group litigation which provided the following: the rescission of the stock purchase agreement of March 25, 1969; the return to Consumers of the 280,000 shares of common capital stock of Consumers; the cancellation of the note of the Dunne Group to Consumers in the amount of $3,360,000; the retention by Consumers of the $280,000 paid by the Dunne Group; the delivery by Consumers to the Dunne Group of a promissory note in the face amount of $200,000 executed by Red Ram of America, Inc. (then in default); the release by the Dunne Group of Consumers, its officers, directors and employees, and the release by Consumers of the Dunne Group. The effect of the settlement would be to reduce the issued and outstanding shares of common capital stock from 822,914 to 542,914 shares.

The Davoust proposals to terminate the United litigation were considered by the Consumers board of directors for six hours on February 23, 1970; a reso-

lution of approval was adopted. At a pretrial conference on March 26, 1970, the trial court suggested that the proposals be formalized in a petition for approval and that notice of the hearing be sent to all shareholders, the S.E.C. and other interested parties. Thereafter, the petition was filed. Van Tuyl and the Dunne Group filed written objections. A pretrial conference was held on April 29, 1970, at which the proposals and objections were discussed. There followed twenty-five hours of discussion between the Consumers board and the proponents and objectors from April 29 to May 4, 1970. As a result of these discussions, Davoust offered modified proposals.

Rule 23(e) provides in regard to class actions and Rule 23.1 provides in regard to derivative actions that they "shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to" all members of the class in class actions and to "shareholders or members" in derivative actions "in such manner as the court directs."

On May 14, 1970, the trial court entered its order that No. 25 was properly maintained as a class action and that notice be given by ordinary mail to all shareholders. On May 28 notice was mailed to all parties to the three causes of action, all shareholders of Consumers, all shareholders who disposed of their shares between October 21, 1968, and April 1, 1969, the Securities and Exchange Commission and the insurance commissioners of Indiana and Oklahoma. The notice advised the recipients of the hearing of objections to the proposed settlement on June 22, 1970. Notice of the hearing was also published in the Evansville Courier (Evansville, Indiana), the Daily Oklahoman (Oklahoma City) and the Wall Street Journal (national edition) once each on May 24 or May 26, 1970. Thereafter, further written objections were filed by Van Tuyl, Adelia J. Evans, Paul L. Jeffries and O. David Green (a former Consumers employee).

An extensive evidentiary hearing was held on June 22–24, 1970, covering 785 pages of transcript. Ten witnesses were heard and numerous exhibits were received. On July 22, the court entered its findings of fact and conclusions of law. On July 27, it entered its judgment approving the Davoust-United settlement as fair and reasonable and in the best interest of Consumers and its shareholders. Van Tuyl, Evans and Jeffries apparently *ex abundanti cautela* filed four appeals from this judgment—one for each of Nos. 23, 25 and 46 and one from the judgment in the consolidated cause. The four appeals were consolidated in this court. Hereafter, "Van Tuyl" will be used to express the contentions of Van Tuyl, Evans and Jeffries.

Van Tuyl first argues that the burden of proving the fairness of the Davoust-United settlement is upon Davoust, a proposition with which no one quarrels. *See* Norman v. McKee, 290 F. Supp. 29, 32 (N.D.Cal.1968), aff'd, 431 F.2d 769 (9th Cir. 1970).

■■ Van Tuyl's next contention is that Davoust's transaction with his corporation is invalid. It is true that Davoust became a director of Consumers in 1964, that he was elected chairman of the board on December 12, 1969, that he resigned on February 20, 1970, that he was reelected to the board on August 31, 1970, and that he is presently chairman of the board. These dates have no particular significance, however, because "Davoust has consistently insisted that his actions be governed as though he were a director" throughout the transactions in issue. The trial court obviously required proof adequate to sustain the activities of a director with uninterrupted tenure. We shall do the same.

Van Tuyl contends that the transaction is unfair because Davoust was a fiduciary and "the fact that a majority

of Consumers' directors may have approved the transaction with full knowledge does not make it valid." Professor Marsh recently summarized the evolution of directors' transactions in a well-documented survey as follows:[1]

In 1880 it could have been stated with confidence that in the United States the general rule was that any contract between a director and his corporation was voidable at the instance of the corporation or its shareholders, without regard to the fairness or unfairness of the transaction.

\* \* \* \* \* \*

It could have been stated with reasonable confidence in 1910 that the general rule was that a contract between a director and his corporation was valid if it was approved by a disinterested majority of his fellow directors and was not found to be unfair or fraudulent by the court if challenged. \* \* \*

\* \* \* \* \* \*

In 1960 it could be said with some assurance that the general rule was that no transaction of a corporation with any or all of its directors was automatically voidable at the suit of a shareholder, whether there was a disinterested majority of the board or not; but that the courts would review such a contract and subject it to rigid and careful scrutiny, and would invalidate the contract if it was found to be unfair to the corporation.

What is known as the "modern" or "flexible" rule sanctioning a conflict of interest subject only to a review by the court for fairness was adopted, for example, in Illinois in 1960. In Shlensky v. South Parkway Building Corp., 19 Ill.2d 268, 166 N.E.2d 793 (1960), the Illinois Supreme Court specifically overruled previous Illinois decisions requiring approval by a disinterested majority of the board, and held that "transactions between corporations with common directors may be avoided only *if unfair*, and that the directors who would sustain the challenged transaction have the burden of overcoming the presumption against the validity of the transaction by showing its fairness." 19 Ill.2d at 280–281, 166 N.E.2d at 800.

Several states have enacted statutes[2] validating any transaction by a corporation with a director or another corporation in which the director is interested if (1) it is approved by a disinterested majority of the board, with the interested director eligible to be counted as part of the quorum, or (2) it is approved by a majority of the shareholders after disclosure of the director's interest, or (3) it is "fair and reasonable" or "just and reasonable" as to the corporation.

We cite this trend of authority simply for the purpose of indicating that Van Tuyl's emphasis on Davoust's fiduciary position as in and of itself invalidating the transaction is misplaced. Of far greater importance in our view are (1) the fullness of disclosure; (2) the fairness of the settlement from the standpoint of the corporation and its shareholders; and (3) the opportunity given to the shareholders to determine whether full disclosure was made and whether the settlement was fair.

■ Van Tuyl does not contend that the two notices to the class regarding the two settlements were faulty in any respect or failed to disclose enough, nor does he contend that the price received by Consumers for its five assets in the Davoust-United settlement was an unfair price. Nevertheless, we are constrained to examine these features of the compromise, because they are of vital concern to the shareholders of Consumers.

1. Marsh, "Are Directors Trustees? Conflict of Interest and Corporate Morality," 22 Bus.Law 35, 36, 39–40, 43 (1966).

2. Cal.Corp.Code § 820; Nev.Private Corp. Law § 78.140; N.Y.Bus.Corp.Law, Mc-Kinney's Consol.Laws c. 4, § 713; N.C. Bus.Corp.Act § 55–30; S.C.Corp.Act § 12–18.16.

The notice mailed to the more than 5,000 Consumers shareholders and other interested parties states that the Davoust-United settlement was promulgated by Davoust, "former director and former Chairman of the Board of Directors of Consumers," that the Consumers assets were transferred to D.P.C., Inc., "a corporation organized by Davoust," and set forth in reasonably complete detail the issues in the three lawsuits and the terms of the proposed settlement. While it is true that, no matter what a notice included, a great number of shareholders would ignore it, we believe that this notice was entirely adequate to alert the cautious shareholder and his counsel that Davoust was the central party acquiring the United interest in Consumers and to outline the considerations to be given and received by Consumers.

■ The notice stated that the five assets involved were carried on Consumers' books at $1,473,072.32 and were being sold for a cash sales price of $1,-160,000. It is of some importance to note that the original negotiations contemplated a price of $960,000, but the officers and directors of Consumers negotiated this price upward by $200,000. The difference between the book value and sales price of $313,072 consisted of unearned interest on one of the mortgage assets of $161,556, which Consumers has an obligation to pay to the purchaser of the mortgage over a four-year period, and a recorded book loss of $151,516. The five assets were described as "problem assets." Since United was concerned with avoiding a paper loss of over one million dollars on its Consumers investment, the solution of United's problem at a cost to Consumers of $151,516 appears on its face to represent a fair and reasonable compromise for Consumers. The district court found that the purchase price paid by D.P.C. for the five assets was fair and reasonable; there is ample evidence in the record to support the finding.

The next question which a prudent shareholder would want answered concerning Davoust's activities is why Consumers could not have sold the five assets directly to United for the Consumers stock without the intervention of a middleman. Van Tuyl had proposed a direct sale as an alternative to the Davoust proposals. The minutes of the Consumers board meeting which commenced on April 29 and concluded on May 4, 1970, stated:

It was noted, during the course of discussion, that the purchase of such shares and option or commitment to purchase the same [by Consumers directly] would result in a drastic reduction in the capital and surplus of Consumers, as a consequence of which its qualification in certain states, including California, would be jeopardized and the ability of the Company to expand and grow by the writing of additional insurance would be limited if not entirely eliminated. Mr. Mims also noted that reduction of capital and surplus would require approval, in accordance with Indiana law, of the Insurance Commissioner of the State of Indiana and that he was confident that such approval could not be obtained.

Van Tuyl appears to have recognized the validity of these objections to a direct sale since he repeated them as reasons for his counter-proposals to the Davoust proposals. He summarized his proposals as follows:

This proposal calls for Consumers to issue to its shareholders a stock right to purchase a total of 280,000 shares of Consumers' stock for a purchase price to be agreed upon by the Board of Directors. Shares not purchased by the shareholders of Consumers were to be underwritten by such interested parties as were acceptable to the Board of Directors of Consumers with negotiations to take place with the Dunne Group to underwrite the balance of the shares.

Van Tuyl's proposals recognized the need to sell 280,000 shares of Consumers' stock in order to maintain Consumers' capital and surplus. This and other evi-

dence in the record supports the conclusion that there were sound business reasons against a direct sale of the Consumers shares held by United to Consumers.

The next question to be answered is whether United is actually being removed from the picture. Van Tuyl was convinced by the evidentiary hearing that United has no plan nor wish to take over Consumers. The district court found that Davoust is the sole shareholder in D.P.C., Inc.; that in order to finance the purchase of assets from Consumers, D.P.C. secured a loan from First National Bank & Trust Company of Oklahoma City, Oklahoma, in the amount of $1,223,000; that the note was endorsed by Davoust individually and by Equity Properties, Inc., an Oklahoma corporation; that United had no ownership interest in Equity Properties, Inc. and there are no common officers or directors between Equity and United. It is true that the bank holds as additional security a "take-out" letter from United which would require United, if demanded by the bank, to purchase the D.P.C. note, which is secured by a pledge of 124,190 shares of Consumers' stock and all the D.P.C. stock. It is also true that Equity Properties, Inc. has the right at the expiration of two years or upon payment of the D.P.C. note to purchase from Davoust half of D.P.C.'s stock for $500. It is obvious that Davoust and Equity hope to profit from the transaction. It is equally obvious that United can conceivably re-enter the scene.

If we were at liberty to ordain the ideal status for Consumers, we would not select the one in which it finds itself at the present time. Not only is our freedom of choice restricted, however, but so also was that of the district court. On one hand, the court is not in the same posture which exists in ordinary litigation where the court "stands indifferent" when the parties choose to settle litigation. In Rules 23 and 23.1 cases, the district judge is a "third party to the compromise." Masterson v. Per-

gament, 203 F.2d 315, 330 (6th Cir.), cert. denied, 346 U.S. 832, 74 S.Ct. 33, 98 L.Ed. 355 (1953). Judge Wyzanski observed in Heddendorf v. Goldfine, 167 F.Supp. 915, 926 (D.Mass.1958):

> \* \* \* the District Court has been placed by higher authority in the role of \* \* \* what might perhaps be better called *a guardian of absent parties and of the corporation as a whole.* \* \* \* The silence or the absence of shareholders does not relieve the judge of his duty. Indeed it may charge him with an additional responsibility \* \* \*.

■■ On the other hand, the business judgment of the court is not to be substituted for that of the parties whose business is involved. Schleiff v. Chesapeake & O. Ry. Co., 43 F.R.D. 175 (S.D.N.Y.1967). Instead, "the court must weigh the probabilities and possibilities of victory or defeat as indicated by the legal or factual situation presented" and determine whether the compromise, taken as a whole, is in the best interest of the corporation and all its shareholders. Winkelman v. General Motors Corp., 48 F.Supp. 490, 493 (S.D.N.Y.1942); Fielding v. Allen, 99 F.Supp. 137, 141 (S.D.N.Y.1951). The soundness of the district court's conclusion of approval or disapproval may also be determined by a consideration of the court's knowledge of the case drawn from pretrial conferences, dispositions of preliminary motions and matters, oral arguments and reading of briefs, transcripts and affidavits, as well as from the evidence adduced at the hearing on the compromise. *See* Fox v. Glickman Corp., 253 F.Supp. 1005, 1013 (S.D.N.Y.1966). It also appears to be well settled that in reviewing the appropriateness of the settlement approval or disapproval, the reviewing court should intervene only upon a clear showing that the trial court was guilty of an abuse of discretion. West Virginia v. Chas. Pfizer & Co., 440 F.2d 1079, 1085 & n. 1 (2d Cir. 1971).

Here the choice was narrowed to two alternatives, each far short of ideal. One

of them was, in the language of the trial court's findings, to proceed with "expensive and time-consuming litigation, which had and continues to have debilitating and demoralizing effect on Consumers' business, its management, staff, policyholders and stockholders." The other was to approve the Davoust-United settlement.

In favor of the settlement, it appears that the parties, prodded by the court, exhausted every effort to give Consumers options and rights to forestall most of the bad turns the complicated financing arrangements might conceivably take in the future. The court is retaining jurisdiction until February 26, 1972, to exercise some supervisory power over the consummation of the settlement. Whatever rights Consumers may have against Redmond and Bankers, whose actions precipitated the attempted United take-over, are preserved. Although Davoust hopes eventually to profit, at the time of the hearing the quoted market price of Consumers' stock of $4 per share was less than half of what he paid United for those shares, so that he also risks a loss.

"It is in the intrinsic nature of a settlement that no party will completely fulfill the expectations it had at the start of the case." Fox v. Glickman Corp., supra, 253 F.Supp. at 1012. A settlement is the result of compromise; in effecting it, each party expects to make some surrender in order to prevent unprofitable litigation, a harmful effect upon its credit and the wasting of time by its officers. Masterson v. Pergament, supra, 203 F.2d at 330.

Van Tuyl was given every opportunity to find a better solution. He was invited to most of the negotiation sessions with Davoust and other prospective bidders. His only suggestions were wholly impracticable. He gave the impression of being concerned solely with justifying his role in blocking the United threat with the Dunne ploy, and with retaining his own stake in management and con-

trol, which he hoped to perpetuate by keeping the large blocks of Consumers' stock splintered. But the pursuit of revenge or the felt need to justify previous actions is not a proper basis for disapproving an otherwise fair, adequate and reasonable settlement. Percodani v. Riker-Maxson Corp., 50 F.R.D. 473 (S.D.N.Y.1970).

Van Tuyl has argued that we should consider the Davoust-United settlement not standing alone, but together with the Dunne Group settlement and that, when so considered, it can be demonstrated that Davoust will or can eventually control Consumers.

On April 20, 1970, a meeting was held at Kennedy Airport in New York between representatives of Consumers, of the Dunne Group and of Van Tuyl, at which the Dunne Group expressed its desire to rescind and unwind completely the March 25, 1969, sale of 280,000 shares of Consumers' stock. Details of this discussion were reported to the district court at the April 21 pretrial conference. The Consumers board considered a program for rescinding the Dunne transaction on July 24, and on August 12, 1970, authorized execution of a settlement agreement which was substantially a rescission of the sale of shares, dismissal of litigation and mutual releases, except that Consumers retained the $280,000 paid by the Dunne Group and gave to the Dunne Group a defaulted note by "Red Ram," a Consumers' investment made at the recommendation and insistence of the Dunne Group.

Consumers, Marlene B. Pace and the Dunne Group filed their joint petition for approval of the Consumers-Dunne Group settlement. The court followed a notice and hearing procedure similar to that prior to approval of the Davoust-United settlement.

From the standpoint of the shareholders of Consumers, the settlement appears to be the only possible solution to the Dunne litigation. But for Van Tuyl

it represented the end of the game of playing off the Dunne block of stock against the United block of stock, which had proved to be disastrous for Consumers and its shareholders.

The court considered the strengths and weaknesses of the charges and countercharges. The court not only had the benefit of the two lengthy evidentiary hearings of the settlements, but also had heard over 300 pages of testimony and received 27 exhibits on April 18–19, 1969, when he found that it was not in the best interest of Consumers, its policyholders and shareholders to have United obtain control of Consumers. The court held numerous pretrial conferences, listened to oral argument and read briefs and affidavits by all interested parties. The court was justified in also considering additional charges and countercharges by the parties which had not yet been formalized into pleadings. *See* Winkelman v. General Motors Corp., 48 F.Supp. 490, 495–496 (S.D.N.Y.1942).

In answer to Van Tuyl's contention that Davoust may be able to take control of Consumers, the court summarized: "Davoust did not act in any manner prejudicial or unfair to Consumers or its stockholders and was not guilty of any breach of fiduciary obligation to Consumers and its stockholders." We agree. The "opportunity" he now finds himself with was not a corporate opportunity; it was essentially the same opportunity which the Dunne Group had and rejected and which was turned down by hosts of other prospective investors.

We conclude that Judge Holder properly exercised his discretion in approving both settlements. We commend him for the skill and diligence he has demonstrated in the conduct of this difficult and trying litigation.

We affirm the judgment of the district court of July 27, approving the Davoust-United settlement. We also affirm the judgment of October 27, 1970, approving the Dunne Group settlement.